STATE of Missouri, Respondent,

v.

Kelly J. BRAND, Appellant.

No. WD 71068.

Missouri Court of Appeals,
Western District.

May 18, 2010.

Matthew Ward, Assistant State Public Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, Richard A. Starnes, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division I: KAREN KING MITCHELL, Presiding Judge, and LISA WHITE HARDWICK and CYNTHIA L. MARTIN, Judges.

KAREN KING MITCHELL, Presiding Judge.

Kelly J. Brand appeals her convictions of possession of a controlled substance in violation of section 195.202 [1] and possession of drug paraphernalia in violation of section 195.233, after a jury trial in Harrison County and for which she was sentenced to five years imprisonment. On appeal, Brand claims that the trial court erred in admitting evidence seized in what she argues was an unconstitutional search of an automobile and in admitting evidence of other uncharged crimes. She claims that the evidence of uncharged crimes was irrelevant to the determination of whether she possessed methamphetamine or a methamphetamine pipe. We affirm the judgment of the trial court.

**Factual and Procedural Background[2]**

On January 28, 2008, off-duty Missouri State Highway Patrol Trooper Jason Cross saw Brand and William Worley arguing in a Wal–Mart store in Bethany, Missouri. Worley was holding a one-gallon can of Coleman camping fuel. Cross thought the pair looked suspicious and watched them in the store. Worley purchased the camping fuel and some lithium batteries. Through his training, Trooper Cross knew that camping fuel and lithium batteries were essential components to one process used to manufacture methamphetamine.

Trooper Cross called the Bethany Police Department and told Officer Brian Holloway what he had observed. While he was talking to Officer Holloway, he followed Worley out of the store and saw him enter

---

1. All statutory references are to RSMo 2000, unless otherwise noted.

2. "We review the facts in the light most favorable to the jury's verdict." *State v. Elam,* 89 S.W.3d 517, 520 (Mo.App. W.D.2002).

a red Dodge Durango with Iowa license plates.

Officer Holloway drove through the Wal–Mart parking lot and found the Dodge Durango matching the description that Cross had given him. Because he was in a marked patrol car, he contacted Harrison County Deputy Coleman, who was in an unmarked patrol car, advised him of the situation, and had him watch the Durango.

Officer Holloway waited in the area until Deputy Coleman advised him on the radio that the Durango was leaving the parking lot. Officer Holloway saw the Durango on a connecting street to the parking lot. The Durango did not signal when it turned onto another street or when it changed lanes shortly thereafter. The officer directed Deputy Coleman, who was directly behind the Durango, to stop it. The deputy stopped the Durango.

Officer Holloway arrived at the scene and approached the driver, Deana Doman–Bishop. Worley was in the front passenger seat and Brand was in the right rear passenger seat. There was a purse in the back seat, which at one point Brand had in her hands. The occupants of the Durango gave their identification cards to Officer Holloway. Worley was acting very nervous; he was visibly shaking as he handed his identification to Officer Holloway.

The officer asked Doman–Bishop to step out of the Durango and follow him to Deputy Coleman's car, which was directly behind the Durango and closer than his own vehicle. In the deputy's car, Officer Holloway checked all of the identifications for warrants but found none. The officer handed Doman–Bishop's license back to her and gave her a warning about the traffic violation. He then asked her if she were willing to speak with him further, and she asked him what he wanted to talk about. Officer Holloway asked Doman–Bishop if she had any illegal items in her car. She told him that she did not and invited him to look in her car. Officer Holloway asked her whether she was consenting to a search of her automobile, and she responded, "Go ahead and look. I don't have anything."

Officer Holloway left Doman–Bishop in the deputy's car with Deputy Coleman. He approached the passengers in the Durango, got the remaining occupants out of the vehicle, patted them down, and told them to have seats in patrol cars to stay warm. Brand was placed in Officer Holloway's car, and Worley was placed in the vehicle of another Missouri State Highway Patrol trooper who had stopped to give assistance.

Officer Holloway then searched the Durango. In Wal–Mart bags found behind the driver's seat, he found two cans of Coleman fuel, two cans of engine starting fluid, and a respiratory mask. Ether, the main ingredient of engine starting fluid, is also used in the production of methamphetamine. A 100–count case of needle syringes was found on the rear driver's-side seat. A bottle of pseudoephedrine was found on the console between the two front passenger seats. A ".38 special" gun was found on the right rear passenger floorboard, where Brand's feet would have been. The gun had six bullets in it, and twenty-one other bullets were found in a bag under the front passenger's seat.

Officer Holloway found a purse in the same area as the gun. It was the same purse he had seen in Brand's hands earlier. Without seeking further consent, Officer Holloway opened the purse. Inside the purse was a zippered pouch that contained three baggies of an off-white powder. The powder was later determined to be methamphetamine. The zippered pouch also contained a glass pipe wrapped

in a bandana. The pipe contained methamphetamine residue. Also in the purse, Officer Holloway found three or four containers of marijuana, a marijuana pipe, a plastic bag of marijuana, two packages of rolling papers, a cigarette rolling machine, digital scales, a canceled check in Brand's name, a bank statement for Brand's son, and a piece of mail addressed to Brand.

Doman–Bishop told Officer Holloway that the purse was Brand's, and Brand was arrested for possession of methamphetamine and for possession of the methamphetamine pipe.

Before the trial, defense counsel moved to suppress the evidence found in the Durango. At trial, counsel renewed the motion before the State presented its case in chief, and again when Officer Holloway testified about what he found when he searched the Durango. The trial court did not allow a continuing objection, so counsel objected to each piece of evidence as it was introduced. The trial court overruled all of defense counsel's motions to suppress the evidence. The jury found Brand guilty, and this appeal follows.

### Standard of Review

■■■■ "When reviewing the trial court's overruling of a motion to suppress, [an appellate] [c]ourt considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *State v. Pike,* 162 S.W.3d 464, 472 (Mo. banc 2005). We will reverse the trial court's ruling only if it is clearly erroneous. *State v. Milliorn,* 794 S.W.2d 181, 183 (Mo. banc 1990). Whether the Fourth Amendment has been violated, however, is an issue of law that we

review *de novo.* *State v. Sullivan,* 49 S.W.3d 800, 806 (Mo.App. W.D.2001).

■■ Once the evidence has been found not to have been obtained in violation of the Fourth Amendment, we review the admissibility of the evidence for abuse of discretion. *State v. Mozee,* 112 S.W.3d 102, 105 (Mo.App. W.D.2003).

### Legality of Search

■■■ Brand's first point on appeal is that Officer Holloway's search of Doman–Bishop's car and, thus, of Brand's purse,[3] which was in the car, violated the Fourth Amendment's prohibition of unreasonable searches and seizures. As a general rule, warrantless searches are considered unreasonable and, therefore, prohibited by the Fourth Amendment. *State v. Martin,* 79 S.W.3d 912, 916 (Mo.App. E.D.2002). When a defendant moves to suppress evidence found as a result of a search that she claims violates the Fourth Amendment, it is the State's burden to show that the search was reasonable and that it was conducted under circumstances such that a warrant was not required. *Id.* One case where a warrant is not required for law enforcement to conduct a search of an automobile is when the owner of the automobile voluntarily consents to the search. *Sullivan,* 49 S.W.3d at 813. Brand acknowledges that Doman–Bishop gave Officer Holloway her consent for his search of her vehicle. However, she claims that by the time the consent was given, Doman–Bishop and the other occupants of the automobile were being detained beyond the reasonable scope of the initial stop of the automobile, thus negating the volun-

---

**3.** As stated in note 3, *infra,* Brand argued before the trial court that the search of her purse, specifically, was in violation of her Fourth Amendment rights in that Doman–

Bishop did not have standing to consent to the search of Brand's purse. This argument has been abandoned on appeal.

tariness of the consent and rendering the search illegal.[4]

■■■■ The State offers two different justifications for the stop of Doman–Bishop's automobile. First, the State claims that Doman–Bishop was properly stopped for a traffic violation. Police may briefly stop an automobile when they observe a violation of the traffic laws. *Martin,* 79 S.W.3d at 916. Officer Holloway stopped Doman–Bishop because he observed her make a right-hand turn and then a lane change without using her turn signals. Thus, the stop of the Durango and its occupants was a proper traffic stop, even though it is considered a seizure of the occupants within the meaning of the Fourth Amendment. *Id.* Traffic stops may not go on indefinitely, however, while law enforcement conducts investigation of other suspected criminal activity. "[I]f the detention extends beyond the time reasonably necessary to effect its initial purpose [in this case, the traffic stop], the seizure may lose its lawful character unless a new factual predicate for reasonable suspicion is found during the period of lawful seizure." *Id.*

Brand argues that by the time Officer Holloway asked Doman–Bishop whether anything illegal could be found in her vehicle and whether he might search it, the traffic stop had effectively terminated. Officer Holloway had already run the computer search of the identifications of the Durango's occupants and had already given Doman–Bishop an oral warning about her traffic offense.[5] Because Officer Holloway had already given Doman–Bishop her warning, Brand claims that the stop had concluded and that Officer Holloway was not entitled to ask Doman–Bishop any more questions.

Brand cites two Missouri cases where it was found that consent to search an automobile had been given after the traffic stop had ended, thus rendering the search illegal and warranting suppression of evidence. In *State v. Granado,* 148 S.W.3d 309, 310 (Mo. banc 2004), a vehicle was stopped for weaving on an interstate highway. The patrolman conducting the stop had the driver of the vehicle accompany him to his patrol car while he ran the driver's identification. *Id.* The patrolman asked the driver several questions while the identification check was ongoing. *Id.* The patrolman then returned to the vehicle to retrieve the proof of registration, at which time he asked several questions of the vehicle's passenger; the answers to

---

**4.** Brand did challenge the search of the Durango before the trial court, making this same argument and also apparently arguing that Doman–Bishop did not have standing to consent to the search of Brand's purse. The trial court's order denying Brand's motion to suppress the evidence at trial that has been included in the record addresses only the fact that the search of the purse, as a container in the vehicle, was within the scope of the consent search of the vehicle, citing *State v. Shoults,* 159 S.W.3d 441 (Mo.App. E.D.2005). The judgment of the trial court is a form judgment wherein the trial court checked boxes delineating the offenses charged, the verdicts, and the sentences imposed, and it does not set forth any conclusions of law. The State's submissions to the trial court are also not included in the record. Accordingly, assuming that the State offered both of the justifications for the stop at the trial-court level that it offers here, it is unclear under which of the two justifications the trial court found the stop and subsequent consent search to have been properly conducted. This opinion, therefore, addresses both justifications.

**5.** We note that Brand did not challenge the fact that Officer Holloway requested all of the Durango's occupants to produce identification, and we take no position in this opinion on the propriety of an officer's running a check on the identifications of passengers as part of a routine traffic stop. *See State v. Waldrup,* —— S.W.3d ——, —— (Mo.App. W.D.2010).

the questions were inconsistent with those the driver had provided. *Id.* The patrolman returned to the patrol car, gave the driver a warning about the traffic violation, and told him he was free to go. *Id.* Then, just before the driver reached his vehicle to leave, the patrolman re-engaged the driver, informed him that his passenger's story varied from his own, and requested the driver's consent to search the vehicle. *Id.* When the driver refused, the patrolman told the driver that he could not remove the vehicle until it could be observed by a K–9 unit. *Id.* at 310–11. The K–9 unit arrived at the scene, alerted to the vehicle, and a subsequent search revealed thirty-six pounds of marijuana. *Id.* at 311.

In reversing Granado's conviction and the trial court's overruling of the motion to suppress, the Missouri Supreme Court stated:

> The purpose of the stop, to investigate a traffic violation, was satisfied as soon as Granado stepped out of the patrol car. Once these steps were completed, the patrolman was required to allow Granado to proceed without further questioning unless specific, articulable facts created an objectively reasonable suspicion

that the individual was involved in criminal activity.

*Id.*

*State v. Sanchez,* 178 S.W.3d 549 (Mo. App. W.D.2005), has similar facts: the car was stopped for a traffic violation; the driver was questioned in the patrol vehicle while the patrolman investigated the occupants' identifications; the driver was issued a warning and was told that she was free to go; and then the driver was re-engaged by the officer just before getting back into her vehicle. *Id.* at 550–52. Also as in *Granado,* the patrolman requested consent to search the vehicle; consent was refused; and the vehicle was retained while a canine unit was summoned to the scene. *Id.* at 552. In *Sanchez,* this court cited *Granado* and noted that, when the officer told the driver that she was free to go, the traffic stop had ended. *Id.* at 555. Because the officer detained the vehicle after the traffic stop had ended, the subsequent search of the automobile, which revealed a large amount of drugs, was conducted in violation of the Fourth Amendment, and the evidence was, therefore, inadmissible. *Id.* at 555–56.

■■■ We find the case at bar distinguishable from *Granado* and *Sanchez.*[6]

---

**6.** We also find that *State v. Vogler,* 297 S.W.3d 116 (Mo.App. S.D.2009), is distinguishable. In *Vogler,* the driver was told at the outset that he would only receive a warning. *Id.* at 117. The driver was also told to wait in his own vehicle while the stopping officer ran the driver's license check. *Id.* Therefore, when the officer had completed the check and returned the license to the driver, the stop had been completed. Also, in *Vogler,* the stopping officer asked the driver whether he might conduct a search of the vehicle and of the driver's person, whereas in this case, Doman–Bishop voluntarily offered to let the officer search her vehicle before the officer asked her whether she were consenting to a search of her vehicle. *See id.* at 118. Interestingly,

*Vogler,* and *State v. Sund,* 215 S.W.3d 719, 723 (Mo. banc 2007), which *Vogler* cites, both stress that the stopping officers had not told the respective drivers that they were free to go when the drivers consented to the searches of their vehicles, indicating that this failure made the requests for consent more coercive and thus not voluntary. By contrast, the cases the State cites here and that we mention above, *Granado* and *Sanchez,* both stress that the officers *had* told the drivers that they were free to go, thus ending the scope of the traffic stops, which then caused the courts to conclude that any further delay of the drivers was improper. *See Sanchez,* 178 S.W.3d at 555, and *Granado,* 148 S.W.3d at 311.

In this case, although Officer Holloway had given Doman–Bishop her warning, she had not yet been told that she could go and had not yet exited his vehicle when Officer Holloway asked her whether he might ask her a few more questions. He had also not yet returned their respective identification cards to Worley and Brand. Doman–Bishop did not refuse to answer further questions, and Officer Holloway immediately then asked her whether there was anything illegal in the Durango. She answered in the negative, and then, unlike the drivers in *Sanchez* and *Granado*, she reportedly offered to let Officer Holloway search the Durango. " '[A] volunteering of consent without a prior request from police is a strong indication of voluntariness.' " *Sullivan*, 49 S.W.3d at 812 n. 8 (quoting *State v. Kennedy*, 290 Or. 493, 624 P.2d 99, 105 (1981)).

Here, in order to reverse the trial court, we would have to conclude that once the investigation of the traffic offense had been completed and a warning or ticket had been given, there could be no additional questioning, regardless of: (1) how little time had passed since the completion of the investigation; (2) the location of the driver; (3) the nature of the questioning; and (4) whether the officer had undertaken any additional actions to end the stop (i.e. returning the passengers' identifications). Such a finding would be a significant and unwarranted extension of the holdings in *Granado* and *Sanchez*. Considering the totality of the circumstances, we do not find that Doman–Bishop was detained unnecessarily or unreasonably after the completion of the traffic stop.

Alternatively, the State argues that, even if a traffic violation had not occurred, the stop of the Durango would have been justified under the principles outlined in *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), because law enforcement officers had a reasonable suspicion that Worley and Brand were engaged in criminal activity. If the stop were justified on this alternative ground, a brief detention and questioning regarding the suspected criminal activity would not run afoul of the Fourth Amendment. Trooper Cross saw Worley and Brand, both of whom appeared suspicious, arguing loudly in the pharmacy section of Wal–Mart. He also noticed that Worley was carrying camping fuel even though it was January and camping was unlikely. The pair's behavior and demeanor made Trooper Cross "immediately" suspicious of them—enough so that he continued to watch Worley while he was in the store. He then noticed that Worley purchased lithium batteries. Through his training as an officer, Trooper Cross knew that camping fuel and lithium batteries, both fairly unusual purchases, were often used together to manufacture methamphetamine. While any of these circumstances individually might not be evidence of any illegal conduct but, instead, consistent with wholly innocent behavior, we look at the totality of the circumstances, which includes consideration of the expertise of law enforcement officials, whose training might make seemingly "unremarkable" behavior seem "quite unusual." *State v. Hawkins*, 137 S.W.3d 549, 558–59 (Mo.App. W.D. 2004) (quoting *United States v. Arvizu*, 534 U.S. 266, 276, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).

Trooper Cross was suspicious enough that Worley and Brand were engaged in criminal activity that he phoned the police station to have someone follow them, even though he was not on duty at the time. We find Trooper Cross's suspicion reasonable and based on articulable facts sufficient to support a brief *Terry*-type stop. The Supreme Court acknowledged that innocent people might be de-

tained briefly while a *Terry* investigation was conducted, but concluded that such a risk was justifiable because it was a "minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." *Illinois v. Wardlow,* 528 U.S. 119, 126, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

If the stop of the Durango had been a *Terry* stop to investigate whether the occupants were engaged in the manufacture of methamphetamine, it would have been reasonable under *Terry.* Officer Holloway checked the occupants' identifications for outstanding warrants and then, apparently, asked Doman–Bishop exactly one question before she offered her consent to search: whether there was anything illegal in the Durango. This is about as brief as an investigation can be without having contraband in plain view. We thus find that the stop of the Durango is justifiable as either a traffic stop or a *Terry* stop and that the consent to search was given voluntarily by Doman–Bishop before the stop had terminated. The evidence was, therefore, not obtained in violation of Brand's rights under the Fourth Amendment.

### Evidence of Uncharged Crimes

■ Brand's second point on appeal is that the trial court erred by admitting evidence of other, uncharged, crimes against Brand to prove that she was guilty of possession of methamphetamine and paraphernalia and that she was prejudiced by the error. Specifically, Brand objects to the trial court's admission of evidence of marijuana, marijuana paraphernalia, ingredients used to manufacture methamphetamine, a handgun, bullets, rolling papers, a cigarette rolling machine, and digital scales that were found either in Brand's purse or elsewhere in the Durango. As a

rule, evidence of uncharged crimes is inadmissible to show that a defendant has a propensity to commit the crimes for which she has been charged. *State v. Harris,* 156 S.W.3d 817, 824 (Mo.App. W.D.2005). Brand argues that the evidence admitted at her trial was improperly allowed to show that she had a propensity to commit the crimes for which she was charged and that the prejudicial value of the evidence outweighed any probative value of the evidence such that it should have been excluded. We disagree.

■ Evidence of uncharged crimes may be admissible to show motive, intent, absence of mistake, the existence of a common scheme or plan, or the identity of the person being charged with the commission of the crime. *State v. Yahne,* 943 S.W.2d 741, 745 (Mo.App. W.D.1997). When a defendant is charged with possession of a controlled substance (or paraphernalia), the State must establish that she had (1) conscious and intentional possession of the controlled substance, either actual or constructive; and (2) awareness of the presence and nature of the substance. § 195.010(34). The State attempted to establish that Brand had constructive possession of the methamphetamine and the methamphetamine pipe by presenting evidence showing that the purse in which the contraband was found belonged to Brand and that it was near her in the Durango.

■ To establish that a defendant is aware of the presence and the nature of a controlled substance, courts will typically admit evidence such as the evidence admitted by the trial court in this case. Evidence of other drugs in possession of the defendant, especially if found at the same time as the controlled substance with which the defendant is being charged of possessing, are admissible to show that the defendant knowingly and intentionally possessed the charged substances. *State v.*

*Allen,* 856 S.W.2d 676, 677 (Mo.App. E.D. 1993) (" '[P]ossession of marijuana is logically relevant to establishing that another drug was possessed with full knowledge of its illegal character.' ") (quoting *State v. Webb,* 646 S.W.2d 415, 417–18 (Mo.App. W.D.1983)). Therefore, Brand's possession of the marijuana and marijuana paraphernalia, rolling papers, and rolling machine were admissible to show that Brand knowingly possessed the methamphetamine and methamphetamine paraphernalia.

■ Evidence tending to show that the defendant is involved in the manufacturing or distribution of a controlled substance also tends to show that the defendant knowingly possessed the substance. *Yahne,* 943 S.W.2d at 746. Thus the camping fuel, lithium batteries, digital scales, and other items used to manufacture methamphetamine were properly admitted by the trial court to show that Brand knowingly possessed the methamphetamine and the methamphetamine pipe.

■ Finally, evidence of a firearm found on or near the defendant is usually admissible to show that the defendant knew of the illegal nature of the substance she has been accused of possessing. *See State v. Charlton,* 114 S.W.3d 378, 384 (Mo.App. S.D.2003). Therefore, it was within the trial court's discretion to admit the evidence of the handgun and the bullets found in the Durango, even though Worley admitted that they belonged to him. In sum, we find that the evidence of the uncharged crimes was properly admissible to establish that Brand knowingly and intentionally possessed the methamphetamine and the methamphetamine pipe, the offenses for which she was on trial. Brand has not shown that the trial court exceeded its discretion in admitting the evidence or that she was unfairly prejudiced by the admission of the evidence. Point denied.

### Conclusion

The search of the Durango was conducted with the consent of its owner and did not violate Brand's rights under the Fourth Amendment. The evidence was also properly admissible to show that she knowingly and intentionally possessed methamphetamine and methamphetamine paraphernalia. Accordingly, we affirm the judgment of the trial court.

LISA WHITE HARDWICK, Judge, and CYNTHIA L. MARTIN, Judge, concur.