**STATE of Missouri, Respondent,**

v.

**Robert M. ALLISON, Appellant.**

**No. WD 70395.**

Missouri Court of Appeals,
Western District.

Sept. 14, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 2, 2010.

Application for Transfer Denied
Dec. 21, 2010.

Daniel E. Hunt, Jefferson City, MO, for appellant.

Shaun J. Mackelprang and John M. Reeves, Jefferson City, MO, for respondent.

Before Division One: JAMES M. SMART, JR., Presiding Judge, MARK PFEIFFER, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Robert Allison ("Allison") appeals from the trial court's judgment finding Allison guilty of seven counts of the Class B felony delivery of a controlled substance, section 195.211,[1] following a jury trial. Allison contends that the trial court: (1) erred by not sustaining a motion to suppress evidence seized from his home and business; (2) erred in overruling objections to Detective Brad Ford's ("Detective Ford") testimony relaying a conversation with a confidential informant; (3) plainly erred in permitting the State to cross examine two of Allison's witnesses about prior misconduct and in permitting the State to rebut the witnesses' denial of the prior misconduct with Detective Ford's testimony; and (4) erred in entering a judgment of guilty on Count 2 which had been dismissed by the State. We amend the trial court's judgment with respect to the determination of guilt on Count 2 and a related finding of dismissal of Count 9. In all other respects, the judgment of the trial court is affirmed.

## Factual and Procedural History

Detective Ford was an undercover narcotics officer for the Fulton Police Department who used an undercover identity.[2] On June 19, 2004, Detective Ford and a confidential informant ("CI") met Allison at the Post Office Bar & Grill. There Detective Ford agreed to buy three and a half grams of methamphetamine from Allison for $200. The three went to Allison's truck, and Allison drove them about a block away. Allison then stopped his car and produced a softball-size bag of methamphetamine from the center console of his truck. Allison retrieved three and a half grams of methamphetamine from the bag, rolled the drugs up in a dollar bill, and gave the drugs to the CI. Allison returned the men to the bar parking lot. The CI later gave the drugs to Detective Ford. Subsequent testing confirmed the substance was methamphetamine, a controlled substance.

---

1. All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

2. We view the facts in the light most favorable to the verdict. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984).

On April 26, 2005, Detective Ford and the CI met with Allison at Allison's auto body shop, K & R Garage. The meeting was scheduled after Allison contacted the CI to ask if he "wanted any medicine." The CI reported the call to Detective Ford who told the CI to call Allison back to arrange a meeting. At the meeting, Allison gave the CI ten pills. Subsequent testing showed the pills to be oxycodone, a controlled substance.

On May 24, 2005, Detective Ford and the CI again met with Allison at his auto body shop. Allison told them that he had forty morphine pills that he did not want. Detective Ford offered to buy the pills from Allison. Allison accepted Detective Ford's offer and retrieved two bags containing the pills. Subsequent testing confirmed the pills were morphine, a controlled substance.

On June 1, 2005, Detective Ford and the CI met with Allison at Allison's apartment in Auxvasse, Missouri. Allison offered Vicodin to both men. Both men accepted the pills. Subsequent testing confirmed the pills were Vicodin, which contains hydrocodone, a controlled substance.

On July 18, 2005, Detective Ford and the CI met with Allison at 1382 Blue Ridge.[3] They discussed purchasing methamphetamine from Allison. Allison did not have any methamphetamine. Allison offered OxyContin pills to both men, which both men accepted. Subsequent testing confirmed the pills to be oxycodone, a form of OxyContin, a controlled substance.

On July 29, 2005, Detective Ford and the CI met with Allison at Allison's apartment to purchase methamphetamine. Cassie Allison, a minor, was present. Allison, Detective Ford, and the CI went into Allison's bedroom and closed the door.

Allison retrieved a bag from his closet and set it on the top of a dresser. Allison pulled out a large triple-beam scale. Allison then retrieved a bag of methamphetamine and measured out an ounce. The purchase price was $1,200. Detective Ford told Allison that he only had $800. Allison replied that he trusted Detective Ford. Detective Ford told Allison that he would pay him the balance the next day. Detective Ford returned the following day with the $400 balance. Subsequent testing confirmed the substance purchased at Allison's apartment was 27.8 grams of methamphetamine.

On September 1, 2005, Detective Ford, the CI, and Allison met at the CI's apartment in Fulton. Detective Ford agreed to purchase two pounds of marijuana from Allison for $1,350. Detective Ford went to his vehicle, retrieved the money, and gave it to Allison. Allison then made a phone call because he did not have the marijuana with him. Allison told Detective Ford to drive to Allison's apartment to pick up the marijuana. Detective Ford did so. Cassie Allison was waiting for him. She produced a block of marijuana from under her shirt and handed it to Detective Ford. Subsequent testing confirmed the substance to be 885 grams of marijuana, a controlled substance.

Allison was charged as a prior and persistent offender with nine counts of the class B felony of delivery of a controlled substance in Callaway County. A motion for change of venue was granted, and venue was moved to Boone County. Counts 2 and 8 were dismissed by the State prior to trial.[4]

Following a jury trial, Allison was found guilty of the remaining seven counts. The trial court sentenced Allison to twenty

---

3. It is not clear from the record whether this address was a business or a residence.

4. The factual predicates for Counts 2 and 8 were not presented to the jury.

years on each count, to run concurrently. This appeal follows.

## Point I

█ In his first point on appeal, Allison claims that the trial court erred in denying a renewed motion to suppress, which sought to exclude from evidence the controlled substances obtained during Detective Ford's purchases at Allison's home and business. Allison claims this evidence was illegally obtained because Detective Ford did not have a warrant, and any consent given to enter the premises was not valid because it was obtained through fraud and deception.

█ The State argues that this claim is not cognizable as Allison has only challenged the trial court's ruling on a motion to suppress. "A trial court's ruling on a motion to suppress is interlocutory and is subject to change during trial. 'Accordingly, a motion to suppress, in and of itself, preserves nothing for appeal, and ordinarily, a point relied on that refers only to a ruling on such motion is fatally defective.'" *State v. Smith*, 185 S.W.3d 747, 755 (Mo. App. S.D.2006) (*quoting State v. Shifkowski*, 57 S.W.3d 309, 316 (Mo.App. S.D. 2001)); *State v. Barriner*, 210 S.W.3d 285, 296 (Mo.App. W.D.2006). Nevertheless, "appellate courts may exercise discretion and attempt to resolve issues on their merits unless the defective point impedes disposition of the case on its merits. A brief impedes disposition on the merits if it fails to give notice of the basis for the claimed error." *Atkins v. McPhetridge*, 213 S.W.3d 116, 120 (Mo.App. S.D.2006) (citation omitted).

Allison renewed his motion to suppress before trial, raised objections at trial to the introduction into evidence of the controlled substances purchased at his home and business,[5] and included the same claims in his motion for new trial. The trial court and the State were on notice at each critical point in the process that Allison was challenging the trial court's admission of the controlled substances as well as the denial of the motion to suppress. Though Allison's point relied on should have referred to the admission of the evidence over objection, and not simply to the denial of the motion to suppress, the point relied on and the brief do not impede the State's ability to address Allison's claimed error under the circumstances. Thus, we will treat Allison's first point on appeal as challenging both the denial of the motion to suppress and the admission of the evidence related to Detective Ford's entry into Allison's home and business without a warrant or valid consent.

### *Standard of Review*

█ We consider the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling on a motion to suppress. *State v. Brand*, 309 S.W.3d 887, 892 (Mo.App. W.D.2010). We will reverse the trial court's ruling only if it is clearly erroneous. *Id.* "We consider all facts and reasonable inferences in the light most favorable to the trial court's ruling." *State v. Cain*, 287 S.W.3d 699, 705 (Mo.App. S.D.2009). "Whether the Fourth Amendment has been violated, however, is an

---

**5.** Before Detective Ford testified about the first purchase of a controlled substance at Allison's place of business, Allison's trial counsel objected, stating that "the testimony we're about to hear taking place at the place of business of the defendant, allegedly, is-was in violation of the defendant's Fourth Amend-

ment rights. I want to preserve and renew my objections previously brought before this Court on that matter." The trial court overruled trial counsel's objection. Trial counsel asked for and received a continuing objection applying to all of the purchases at Allison's business and home.

issue of law that we review *de novo.*" *Brand,* 309 S.W.3d at 892. Once evidence has been found not to have been obtained in violation of the Fourth Amendment, we review its admission into evidence for an abuse of discretion. *Id.*

### Analysis

 The Fourth Amendment to the United States Constitution guarantees citizens the right to be free from "unreasonable searches and seizures." "Article I, section 15 of the Missouri Constitution provides the same guarantees against unreasonable search and seizures; thus, the same analysis applies to cases under the Missouri Constitution as under the United States Constitution." *State v. Oliver,* 293 S.W.3d 437, 442 (Mo. banc 2009). As a general rule, "[w]arrantless searches and seizures inside a home are presumptively unreasonable" and unconstitutional. *State v. Rutter,* 93 S.W.3d 714, 723 (Mo. banc 2002). However, one exception to this rule is consent of the owner. *State v. Cromer,* 186 S.W.3d 333, 342 (Mo.App. W.D.2005).

 Allison contends that he could not have given valid consent to Detective Ford to enter his home and business because he was deceived by Detective Ford's undercover status. This argument has no merit. It is well settled that the purchase of a controlled substance by an undercover officer is not a search or a seizure and that law enforcement is "entitled to use decoys and to conceal the identity of its agents." *Lewis v. United States,* 385 U.S. 206, 209, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *State v. Evans,* 637 S.W.2d 62, 65 (Mo.App. E.D. 1982).

In *Lewis,* an undercover narcotics agent contacted Lewis to inquire about purchasing drugs. 385 U.S. at 207, 87 S.Ct. 424. Lewis told the agent that he could "take care of [him]" and directed the agent to his home. *Id.* On two separate occasions

Lewis received the undercover agent in his home and sold him drugs. *Id.* The United State Supreme Court found that there was no exercise of "governmental power to intrude upon protected premises: the visitor was invited and willingly admitted by the suspect." *Id.* at 212, 87 S.Ct. 424.

Allison attempts to distinguish his case from *Lewis* arguing that there is no evidence that he invited Detective Ford to his home or business. In so arguing, Allison essentially asks us to construe the reference to "invite" in *Lewis* as requiring an advance, express invitation. Allison offers no legal or logical support for construing "invite" so narrowly. Though in *Lewis* there was evidence that the undercover officer appeared at the defendant's home after he had been invited in advance, it was also relevant to the Supreme Court that when the undercover officer appeared at the defendant's door and identified himself by his alias, he was willingly admitted by the defendant. *Id.* at 207, 87 S.Ct. 424. In this case, on each occasion that Detective Ford purchased narcotics from Allison at Allison's home or business, Allison willingly invited Detective Ford to enter. An invitation to enter extended at the moment a visitor arrives is no less an invitation than one extended before the visitor arrives.

 Detective Ford was permitted to enter Allison's home and business on four separate occasions. These occasions followed the commencement of a relationship between Detective Ford and Allison at the Post Office Bar & Grill. That relationship centered on Allison's sale of controlled substances to Detective Ford. Allison permitted his home and his business to be used to sell narcotics. It is reasonable to infer that Allison willingly permitted Detective Ford and the CI to enter his home and business on each occasion knowing

they were there to purchase controlled substances.

> [W]hen ... the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.

*Id.* at 211, 87 S.Ct. 424. Although Allison did not know that Detective Ford was an undercover agent, Allison willingly granted Detective Ford entry each time Detective Ford appeared at Allison's home or business to buy drugs. Detective Ford's pretense merely encouraged Allison to say and do things he was willing and anxious to say and do to anyone who would be interested in buying controlled substances. *Id.*

The trial court did not clearly err in denying Allison's motion to suppress. Moreover, the trial court did not abuse its discretion in permitting the controlled substances obtained by Detective Ford following invited entry into Allison's home and business to be received into evidence. Point One is denied.

### Point II

In his second point on appeal, Allison argues that the trial court erred in overruling his objection to Detective Ford's testimony relaying a statement made to him by the CI. Allison maintains that the CI's out of court statement was testimonial hearsay which violated his rights under the Confrontation Clause because the CI was not available for cross examination.

### Standard of Review

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Coats*, 835 S.W.2d 430, 433 (Mo.App. E.D.1992). An abuse of discretion only exists if " 'a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.' " *State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007) (citation omitted). However, whether Allison's constitutional rights under the Confrontation Clause were violated is a question of law that we review *de novo*.

### Analysis

At trial Ford testified regarding events that took place on April 25, 2005, and stated:

A: I had my confidential informant with me again.

Q: Okay. In your interaction with Mr. Allison on that particular date, did the issue of drugs come up then?

A: Yes.

Q: And how did they come up then?

A: Mr. Allison contacted my confidential informant and asked him if he wanted any medicine.

Allison's Counsel: Well, your Honor, that is based on hearsay I believe. This witness wasn't present for that conversation.

The Court: Objection will be overruled.

Q: And what, if anything, did you do in response to Mr.-the discussion of medicine?

A: I directed my confidential informant to call Mr. Allison back and tell him yes, he was interested in some medicine, and that we would go to his shop, his garage, and meet him there.

Allison's Counsel: Your Honor, I also want to offer the objection that I think this particular testimony is self-serving.

The Court: Objection will be overruled.

Allison maintains that the conversation between Allison and the CI is inadmissible hearsay. We disagree.

■ It is discernible from the questions asked that Detective Ford's testimony about the conversation with the CI was not offered to prove the truth of the matter asserted-that Allison contacted the CI and offered to sell him "medicine." Rather, it is evident from the questions asked that the testimony was elicited to explain Detective Ford's subsequent conduct. "[A]n out-of-court statement offered not for the truth of the matter asserted, but to explain subsequent police conduct, is not hearsay and is therefore, admissible assuming it is relevant." *State v. Douglas*, 131 S.W.3d 818, 824 (Mo.App. W.D.2004). "It is well established that such testimony is admissible to explain the officer's conduct, supplying relevant background and continuity to the action." *State v. Brooks*, 618 S.W.2d 22, 25 (Mo. banc 1981). "However, when such out-of-court statements go beyond what is necessary to explain subsequent police conduct, they are hearsay." *Douglas*, 131 S.W.3d at 824. Detective Ford's testimony relating to Allison's offer to sell the CI "medicine" did not go beyond what was reasonably necessary. The testimony provided the jury with an explanation for Detective Ford's direction to the CI to arrange a meeting with Allison at Allison's garage.

■ As a result, the conversation between Allison and the CI was not offered to prove that Allison in fact offered to sell the CI medicine. Thus, the Confrontation Clause is not implicated.[6] *Crawford v. Washington*, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (ruling that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). Point Two is denied.

### Point III

■ In his third point on appeal, Allison claims that the trial court plainly erred in allowing the State to cross-examine defense witnesses Edward Field ("Field") and James Allen ("Allen") regarding drug sales which allegedly involved Detective Ford, and in allowing the State to offer Detective Ford's rebuttal testimony concerning these alleged sales. Allison complains that this testimony constituted improper impeachment with prior unconvicted misconduct.

### *Standard of Review*

■ Allison concedes that he did not properly preserve this point on appeal because he failed to object to any of the aforementioned testimony during trial. Allison requests plain error review pursuant to Rule 30.20. Review of plain error under Rule 30.20 involves a two-step process. "First, we must determine if the claim on its face establishes substantial grounds to find that manifest injustice or miscarriage of justice has resulted." *State*

---

**6.** We also note that "[a] hearsay objection does not preserve constitutional claims relating to the same testimony." *State v. Chambers*, 891 S.W.2d 93, 104 (Mo. banc 1994). "To preserve appellate review, constitutional claims must be made at the first opportunity, with citation to the specific constitutional sections." *Id.* at 103–04. Allison's trial counsel did not make a specific objection at trial relating to the constitutionality of the admission of the CI's conversation with Allison. Thus, even had Detective Ford's testimony about the conversation been testimonial hearsay, the claim that Allison's constitutional rights had been violated would not have been properly preserved for our review.

*v. Lewis,* 243 S.W.3d 523, 525 (Mo.App. W.D.2008). Not all prejudicial error can be deemed plain error. *State v. Calhoun,* 259 S.W.3d 53, 58 (Mo.App. W.D.2008). "Plain error is evident, obvious, and clear error." *Id.* If plain error is evident on the face of the claim, then we may proceed to consider whether or not a miscarriage of justice or manifest injustice will occur if left uncorrected. *Lewis,* 243 S.W.3d at 525. Where no plain error appears on the face of the claim, we should decline to exercise our discretion to review the claim. *Id.* For the reasons hereinafter discussed, no plain error appears on the face of Allison's claim, and we decline to exercise our discretion to review the claim.

### Analysis

■■■ Detective Ford was called as a witness in the State's case. Ford testified on direct examination that whenever he and his CI were involved in a drug buy, he would check the CI for drugs, he would always maintain eye contact with his CI, and he would immediately take whatever drugs were obtained in the drug buy from the CI and package them as evidence.

On cross-examination, Allison attempted to impeach Detective Ford's credibility by asking whether Detective Ford had ever witnessed the CI using illegal drugs. Detective Ford denied that he had ever witnessed the CI using illegal drugs.

Allison called Field, who testified that he had witnessed the CI smoking crack cocaine in Detective Ford's presence on more than twenty different occasions. Field testified that there was no doubt in his mind that the CI was actually smoking crack cocaine and was not just pretending. On cross-examination by the State, Field conceded that he did not want anyone to believe Ford's testimony, because Ford was currently "bringing down trouble on [his] brother." The State asked Field whether he had sold drugs to Detective Ford on two separate occasions. Field denied that he sold drugs to Ford.

Allison called Allen, who testified that he had seen the CI on three occasions in the presence of Detective Ford smoking out of a glass tube that he put white rocks into and lit. On cross-examination, the State asked Allen if he had a "particular stake in whether or not people believe Detective Ford?" Allen testified that he did not. The State asked Allen if it was true that he had used his fiancée to negotiate the sale of narcotics with Detective Ford. Allen denied this activity.

The State then recalled Detective Ford in rebuttal. Detective Ford testified that he had never in his thirteen years as an undercover narcotics agent allowed a confidential informant to use drugs in his presence. Detective Ford also testified that he never saw the CI smoke crack in his presence and that he would not use someone as an informant if they used drugs in his presence. Detective Ford further testified that Allen had sold him methamphetamine via his girlfriend and that Field had sold him OxyContin and methamphetamine.

This summarized testimony reveals four separate efforts at impeachment. First, Allison attempted to impeach Detective Ford by asking Detective Ford about the CI's use of drugs in his presence. Second, Allison elicited testimony from Field and Allen to rebut Detective Ford's denial of the CI's use of drugs in his presence. Third, the State attempted to impeach both Field and Allen by questioning each of them about their potential bias and about prior drug sales to Detective Ford. Fourth, the State elicited Detective Ford's testimony to rebut Field's and Allen's testimony about the CI's use of drugs in his presence and to rebut Field's and Allen's denial of drug sales to Detective Ford. The first and third efforts involved impeach-

ment of a witness through cross examination about prior conduct. The second and fourth efforts involved impeachment of a witness through the introduction of extrinsic evidence. Allison only complains, of course, about the third and fourth efforts at impeachment which were undertaken by the State, as the first and second efforts involved Allison's efforts to impeach Detective Ford.

The proper methods for impeaching a witness were exhaustively explored by our Supreme Court in *Mitchell v. Kardesch,* 313 S.W.3d 667, 676–77 (Mo. banc 2010). Impeachment efforts fall, roughly, into two categories—impeachment by cross examination inquiry involving specific conduct, and impeachment through the introduction of extrinsic evidence.

During *cross examination,* a witness may be impeached at anytime by *inquiring of the witness* about *any matter* (even a collateral matter) involving (1) the witness's ability to perceive, (2) the witness's bias, (3) the witness's prior inconsistent statements, (4) the witness's prior convictions, or (5) evidence of the witness's character for truthfulness and veracity.[7] *Id.* at 675. The latter category—evidence of a witness's character for truthfulness and veracity—generates the greatest confusion. "When a person, regardless of whether a party, is being questioned on the witness stand ... that ... person may be asked about specific instances of his or her own conduct that *speak to his or her own character for truth or veracity ...."* *Id.* at 677 (emphasis added). There is no hard and fast rule for determining when a specific instance of conduct speaks to a witness's truth or veracity. However, it is clear that this limitation would not permit inquiry about every prior bad act. Bad moral character and character for truth and veracity are not synonymous.

If a witness on cross examination *denies* the matter about which inquiry has been made, the question turns to whether the witness's denial is binding on the questioner, precluding further inquiry or extrinsic proof. The ability to use *extrinsic evidence* to impeach (that is to say, documentary or testimonial evidence offered to combat a witness's denial of a matter during cross examination) varies depending on the method of impeachment employed. *Id.* at 679. "Parties are permitted to introduce extrinsic evidence to impeach a witness by showing his or her inability to perceive the events testified to; prior convictions; or to show bias, prejudice or interest in the proceeding, *regardless of whether the subject of the extrinsic evidence is independently material to the case."* *Id.* (emphasis added). Parties are permitted to introduce extrinsic evidence of a witness's prior inconsistent statement *if the subject of the prior inconsistent statement is material to the issues rather than collateral. Id.* at 679–80. Following *Mitchell,* parties are permitted a *limited* ability to use extrinsic evidence of prior conduct involving a witness's character for truth and veracity *following the trial court's determination "whether admission of the extrinsic evidence would be more probative or more prejudicial."* *Id.* at 682

---

7. Evidence of a witness's character for truth and veracity (both favorable and unfavorable) can also be shown through the testimony of a different witness. However, such a witness is only permitted to testify "about the other person's general reputation in the community for truth and veracity." *Id.* at 677. "Only once the witness has testified to the other's reputa-tion may he or she be cross-examined in good faith about specific instances or conduct, and even then only as a means of testing the accuracy of the witness's testimony about the other's reputation for truthfulness by asking whether the person on the stand has 'heard about' a particular matter." *Id.* at 678.

(emphasis added). With respect to this latter category of extrinsic evidence, "[i]n cases involving character of the witness for truth and veracity, it will be the unusual case where that balancing weighs in favor of admission of extrinsic evidence." *Id.*[8]

We apply the holdings of *Mitchell* to the four efforts at impeachment in this case. First, Allison's inquiry of Detective Ford about the CI's use of drugs in his presence was proper impeachment. Allison cross examined Detective Ford about specific conduct relating to the Detective's character for truth and veracity, as Detective Ford had just testified on direct examination that he had never permitted the CI to use drugs in his presence. Detective Ford denied permitting the CI to use drugs in his presence on cross examination.

Second, Allison introduced extrinsic evidence of Detective Ford's lack of character for truth and veracity via the direct examination of Field and Allen that, in fact, the CI had used drugs in Detective Ford's presence. This was not proper impeachment, as this was not "the unusual case" where the balancing of probative value and prejudicial effect would have weighed in

favor of admission of the extrinsic evidence.

Third, the State inquired of Field and Allen on cross examination about their personal dislike of Detective Ford, and then asked about prior drug sales to Detective Ford for the arguable purpose of demonstrating a motivation for their bias. In the alternative, the questions asked of Field and Allen about prior drug sales to Detective Ford arguably related to their character for truth and veracity.[9] In either case, this was proper impeachment. As previously noted, a witness can be asked about *any* conduct on cross examination, even conduct relating to collateral matters, if the conduct relates to one of the recognized categories of impeachment. *Id.* at 675.

Fourth, the State called Detective Ford in rebuttal. Detective Ford's testimony introduced extrinsic evidence of Field's and Allen's denied drug sales. If offered as extrinsic evidence on the subject of these witnesses' character for truth and veracity, the testimony would have been problematic, absent application of the balancing test required by *Mitchell.* However-

---

8. It does not appear that *Mitchell* has changed the general rule that a prior inconsistent statement that is itself material to the issues in the case can be offered as extrinsic evidence to impeach. There is confusion on this point, but only because the extrinsic evidence involved in *Mitchell* happened to be an interrogatory answer by the witness that his license to practice medicine had never been suspended. *Id.* at 670. The witness later admitted in a deposition that his license had been suspended and that the interrogatory answer was false. *Id.* The trial court would not permit the plaintiff to impeach the witness (who was the defendant) by asking him about the admission in his deposition. As a result, the trial court would not permit the plaintiff to use the deposition or the interrogatory answer as extrinsic evidence should the witness have denied the deposition admissions during cross examination. Though the extrinsic evidence included the deposition

and a prior sworn interrogatory answer, neither was sought to be used as a prior inconsistent statement but, instead, as extrinsic evidence of prior conduct that was relevant to the witness's character for truth and veracity. *Id.*

9. We do not mean to suggest that inquiries about prior unconvicted criminal activity should be construed as universally relevant to a witness's character for truth and veracity, and in fact, we caution against such an assumption. But where, as here, no objection has been made to preserve a claim of error, we cannot conclude that a manifest injustice has occurred when such conduct has been inquired into, as the questioner could have made a case, had a timely objection been registered, that the inquiry was relevant to the witness's character for truth and veracity.

er, this extrinsic evidence could have been offered to show that these witnesses were biased against Detective Ford, as the conduct could reveal that the witnesses were interested in challenging Detective Ford's credibility in order to satisfy a personal agenda. As previously noted, extrinsic evidence offered to show bias is generally admissible, even if the evidence involves a collateral matter. *Id.* at 679. Because it is possible on this record that Detective Ford's rebuttal testimony represented proper impeachment in the form of bias, we are not prepared to exercise our discretion to conduct plain error review.

In any event, Allison "opened the door" to the State's impeachment efforts about which he now complains. Allison improperly introduced extrinsic evidence through the testimony of Field and Allen about the CI's use of drugs in Detective Ford's presence for the purpose of impeaching Detective Ford's character for truth and veracity. In fact, this appears to have been a purposeful trial strategy undertaken by Allison. Allison concedes that Allison's "entire defense relied on the lack of credibility of [Detective] Ford." [Appellant's Br., pg. 19]. Allison argues that the State's discrediting of Field and Allen "on the very important issue of whether [Detective] Ford lied under oath with respect to the conduct of his [CI]" was manifestly unjust. [Appellant's Br., pg. 19]. However, Allison ignores that he invited the State's impeachment of Field and Allen by first engaging in improper extrinsic evidence impeachment of Detective Ford. We are not inclined to afford Allison's claim plain error review under these circumstances.

Point Three is denied.

### Point IV

In his fourth point on appeal, Allison claims that the trial court erred in entering judgment finding him guilty of Count 2 because the State dismissed Count 2. Allison maintains that he could not have been convicted of this count because there was no evidence presented at trial regarding this charge.

The State concedes that the judgment entered by the trial court is in error not only in this respect but also by improperly stating that Count 9 was dismissed. The State argues that the judgment reflects a clerical error, as it should have shown Count 2 was dismissed, and that Allison was convicted of Count 9. Both counts were for the same charge—delivery of a controlled substance—though the counts obviously involved different factual predicates. The State urges that the trial court's judgment should be corrected by a *nunc pro tunc* order.

At trial, the factual predicates for Count 2 and Count 8, which the State had previously dismissed, were not submitted to the jury. For purposes of instructing the jury, however, the remaining seven counts (Counts 1, 3–7, and 9) were renumbered in seven separate verdict directors, such that Count 1 was called Count I, Count 3 was called Count II, Count 4 was called Count III, Count 5 was called Count IV, Count 6 was called Count V, Count 7 was called Count VI, and Count 9 was called Count VII. It is clear by comparing to the Indictment that each verdict director, though referencing a renumbered count for purposes of the instruction, correctly referenced the specific date and the involved controlled substance for the corresponding count of the Indictment. The jury found Allison guilty of each of the seven counts submitted, with each verdict reflected on a separate verdict form.

When the trial court imposed sentencing, it noted on the record that Counts 2 and 8 shown on the Indictment had been dismissed. However, the trial court's writ-

ten judgment, though noting that Allison had been convicted of seven counts, improvidently noted a conviction of Count 2 as shown on the Indictment, even though that charge involved a date and a controlled substance not submitted to the jury, and improvidently noted that Count 9 had been dismissed, even though that charge involved a date and a controlled substance which had been submitted to the jury in Instruction No. 12. It is apparent that the trial court mistakenly recorded Allison's convictions in the judgment using the count designations from the jury instructions (Counts I through VII) instead of the count designations from the Indictment (Counts 1, 3–7, and 9).

■ The error on the judgment form is a clerical error, which is clearly discernable from the record. As such there is a basis to support the amendment of the judgment *nunc pro tunc* in order to correctly reflect Allison's convictions. *State v. Partain*, 310 S.W.3d 765, 769 (Mo.App. E.D.2010); *State v. Carroll*, 207 S.W.3d 140, 142 (Mo.App. E.D.2006); Rule 74.06(a). "The purpose of a nunc pro tunc order is to correct clerical omissions or mistakes so that the record speaks the truth by evidencing an act done or a judgment actually rendered at a prior time but not carried into or properly recorded in the record." *Andrae v. Andrae*, 171 S.W.3d 170, 172 (Mo.App. E.D.2005); *Pirtle v. Cook*, 956 S.W.2d 235, 243 (Mo. banc 1997) (finding that a *nunc pro tunc* order was proper to correct a clerical error in the judgment which was a result of transposed terms).

Here, Allison concedes in his Reply Brief that the error described by the State in its Brief was made and should be corrected. There is, therefore, no dispute that the entry of a *nunc pro tunc* order is an appropriate avenue to conform the trial court's judgment to the balance of the record.

As all seven of the counts of which Allison was convicted were for the same charge, delivery of a controlled substance, range of punishment for all were the same, Class B Felony, and as the sentence for each conviction was identical, we see no inherent value in remanding this case for entry of an amended judgment to correct this conceded clerical error. Instead, we will exercise our power pursuant to Rule 30.23 to enter such judgment as the court ought to give as to finally dispose of this case.

### Conclusion

The trial court's judgment is amended by this Opinion to reflect that Count 2 was dismissed by the State and to reflect that Allison was convicted of Count 9. The sentence previously imposed for Count 2 shall remain Allison's sentence for Count 9. In all other respects we affirm the judgment of the trial court.

All concur.