STATE of Missouri, Plaintiff-Respondent,

v.

Gary WHITE, Defendant-Appellant.

No. 36966.

Missouri Court of Appeals,
St. Louis District,
Division One.

April 5, 1977.

 

Robert J. Walsh, Crouppen, Walther, Zwibelman & Walsh, P.C., St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, J. Michael Davis, Asst. Attys. Gen., Jefferson City, Brendan Ryan, Circuit Atty., Daniel J. Murphy, Asst. Circuit Atty., St. Louis, for plaintiff-respondent.

PER CURIAM.

This is an appeal by defendant-appellant, Gary White, from a judgment of conviction entered on March 14, 1975, whereby the court, after a finding of guilty by the jury, sentenced the defendant under the Second Offender Act to twenty-five years in the Department of Corrections for the offense of robbery in the first degree by means of a dangerous and deadly weapon. §§ 560.120, 560.135, 556.280, RSMo.

A jury could reasonably find the following. On September 7, 1974, Russell Wayne Lada was working at the I–55 Service Center located at 4553 South Broadway where he was employed as a part-time service station attendant. He was working the 11:00 p.m. to 7:00 a.m. shift. At approximately 3:00 a.m. on September 7, 1974, a man, later identified as the defendant, Gary White, drove into the station and purchased three quarts of oil for his car. Mr. Lada serviced the defendant's car. It was a '65 Chevy, white over gold. A young woman was seated in the car next to the defendant. The defendant was wearing a "psychedelic multi-colored shirt." At approximately 4:30 a.m., "I [Lada] was getting ready to deposit money in the safe and two black Negro males came up with guns pointed at me [from] outside the door." The two men entered the station building and announced the robbery. The service station building and the parking lot were both well lighted. One of the two men was the defendant— "He had a psychedelic multi-colored shirt on." Both of the men brandished guns. The defendant had a "silver-plated white-handled automatic pistol." The other man, later identified as Amos Ingram, had a black revolver. As the two men entered the station, they ". . . told me to hand them over all the money. I then took the money out of my pockets and put it on top of the table right by the door." Then the defendant and his accomplice began "picking it up and grabbing it." One of the robbers then instructed Lada to open the safe. "I told him I didn't have a key for it and this other Negro male [Ingram] in the station had a gun pointed at my head and told me to open the safe or he was going to blow my head off, something of that nature. I cannot recall the exact words. He then pulled the trigger and I heard the revolver click around but it didn't go off." [1] Lada again informed the two robbers that he did not have a key for the safe ". . . and then he [Ingram] struck me up aside the head with the gun and they more or less tried to open it [safe]—tried to dig money out with—I believe they had a pencil, tried to stick down in the crack to see if they could get some of the money up, and during this time one of the—it was Ingram said something about a police car going by and they kind of ducked down." Then the men

---

1. Officer James Wurm later testified at trial that when he seized the two guns shortly after the robbery both were loaded. An unspent cartridge was also introduced into evidence with a marking on it indicating that the bullet had in fact been struck by the firing mechanism but did not fire.

stood Lada up against the wall and asked him where his gun was. Lada told them that he did not have a gun. The two then left the station after the defendant told Lada "to keep my mouth shut, not to say anything." As the defendant and Ingram left the station, they proceeded "south on Broadway on foot." The entire episode took between four and five minutes.

After the defendant and Ingram had been gone a few minutes, Lada ran from the service station across Broadway. He intended to borrow money from some passers-by so that he could call the police. Mr. Lada encountered a young man and woman who were walking up the street and asked them for money to call the police ". . . and at this time the '65 Chevy, goldish beige color with a white top, came by with its lights off." The car was only about 10–15 feet away from him when it passed by going north on Broadway. The car passed at approximately 30 or 35 m.p.h. so that Lada had an opportunity to view it for approximately 10–15 seconds. "I [Lada] seen it approaching to me and then I saw it go by me." Lada recognized the driver of the car as the defendant. Then the man from whom Lada was attempting to borrow money pointed to a police car that was about 200 yards away. In the police car were police Officers James Wurm and Charles Robertson. They were in the process of patrolling the area and were heading south on Broadway. Their attention was directed to a car that was being driven without its headlights. The car was a " '58 Chevrolet . . . Gold—white over gold I believe it was." [2] Officer Wurm who was driving made a U-turn intending to pursue the car for the traffic violation. "Before I [Wurm] could go any further a subject later found to be Russell Lade [sic] stopped me and advised me that the car just seen going on the entrance ramp [to I–55] was the car that supposedly held him up." The police officers then chased the defendant's car

north on I–55 at speeds of up to 90 m.p.h. "He had his lights out at that time on the car. And as we were approaching and catching up to him the car—suddenly a lot of smoke came from the engine and everything else, at which time the car was—apparently the engine had blown up, and we pulled the car over just right at the Arsenal Avenue—the Arsenal exit." All during the chase and from the time that Mr. Lada pointed out the defendant's car, the police officers never lost sight of defendant's car. It was "[o]nly a matter of two or three minutes till we had the car." As the officers were pulling defendant's car to the curb, "[t]here was a couple objects thrown out the window, rear window, and at which time upon stopping the car I slowed down to allow my partner to alight from the car to cover one side of the car while I pulled the car into the front so that the car couldn't go any further." The officers recovered the objects that were thrown from the defendant's car. The objects were two guns—one was a "P-.38" and the other one was a ".41 Colt." The guns were found in a grassy area 10–15 feet from the car. The defendant, White, was driving the car that the officers pulled over. He was wearing a "floral or a print-type material shirt." In addition to the defendant, Amos Ingram and a woman [not the same one Lada had seen earlier] and a baby were also in the car. The defendant and Ingram were placed under arrest at the scene and a search of the subjects uncovered a total of approximately $120 in their possession. The defendant had about $30 in his pockets and the larger amount of about $90 was found on Ingram.[3]

While Officers Wurm and Robertson were in the process of apprehending the men who robbed Mr. Lada, other police officers arrived at the service station. They obtained a description of the defendant, White, and Amos Ingram from Russell Lada. Officer John Lange testified that

---

**2.** When shown a picture of the automobile, Officer Wurm identified it as a '65 Chevrolet.

**3.** At another point in the record, Officer Wurm testified that appellant had the larger amount in his possession.

Lada told him that " . . . two Negro males [were] armed with hand guns, the taller of the two was wearing a pink turtle–neck shirt and the shorter one was wearing a multi–colored shirt."

The owner of the service station, Mr. Ralph Wahby, arrived at the station and determined that approximately $120 of the day's receipts had been taken. A police radio dispatch indicated that two suspects had been apprehended and arrested at I–55 just north of the Arsenal exit. Russell Lada was then taken by police to the arrest scene where he identified both the defendant and Ingram. When Mr. Lada arrived at the scene the defendant and Ingram were both seated in a police car and were handcuffed. Later, Mr. Lada confronted defendant at a police station for about fifteen to twenty minutes in the presence of officers.

In his first point on appeal appellant contends that the trial court erred in overruling his motion to suppress the in-court identification by Mr. Lada because he viewed the appellant under circumstances which suggested his participation and that the suggestion so tainted the identification so as to deny him his right to due process of law. In essence he contends that the suggestive nature of the pre-trial confrontation between the victim, Mr. Lada, and appellant impermissibly tainted the witness' in-court identification so that it was error for the trial court to overrule appellant's motion to suppress the identification testimony. Specifically, appellant contends that Mr. Russell Lada's viewing of him at the arrest scene while he was handcuffed and seated in a police car constitutes an impermissibly suggestive confrontation which suggests a substantial likelihood of misidentification and thus tainted Lada's in-court identification as one of the perpetrators of the offense.

At trial, Mr. Lada identified the appellant as one of the two men who robbed him. Mr. Lada's identification testimony was the subject of a motion to suppress filed by defendant prior to trial. A pre-trial hearing was held on the motion, but the trial court overruled it. At trial, Mr. Lada's identification testimony was introduced into evidence without objection.

■ After examining the evidence and the authorities relied upon by appellant, we are convinced that appellant's first point is without merit. It is a well-established rule of procedure in Missouri that when a pre-trial motion to suppress identification testimony is made and overruled, timely objection to the identification testimony must be made during the trial and the ground must be included in the motion for new trial in order to preserve the issue for purposes of appellate review. *State v. Greenlaw,* 543 S.W.2d 523, 525 (Mo.App.1976); *State v. Johnson,* 536 S.W.2d 851, 854 (Mo.App. 1976).

■ However, despite this omission, we conclude that the pre-trial identification of appellant was not so impermissibly suggestive so as to give rise to a very substantial likelihood of irreparable misidentification so as to taint the in-court identification. The cases relied upon by the appellant, *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), involved traditional lineups in post-indictment or information situations.

In *State v. Hudson,* 508 S.W.2d 707, 710 (Mo.App.1974), it is stated:

"In evaluating the suggestiveness of a particular confrontation and the likelihood of misidentification, we look to factors such as the opportunity of the witness to view the accused at the time of the alleged crime, the accuracy of the witness's prior description of the accused, the certainty of the witness at the confrontation, the length of time between the crime and the confrontation, and the need for police to determine at the earliest opportunity whether the person suspected is in fact the person sought."

■ The situation presented in this case is one wherein a short time after a crime was committed the police arrested a person

whom they had reason to believe was an offender and had him viewed immediately by the victim. *State v. Dodson,* 491 S.W.2d 334, 337 (Mo. banc 1973). It has often been held that it is not improper, or a violation of due process, for the police immediately to return a freshly apprehended suspect to the scene of the crime for identification by one who has seen the alleged offender earlier. *State v. Barnes,* 537 S.W.2d 576, 578 (Mo. App.1976); *State v. French,* 528 S.W.2d 170, 172 (Mo.App.1975).[4] This same principle is equally applicable when the victim goes to the scene of the arrest rather than the scene of the offense. The pre-trial confrontation was not violative of *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). *State v. Dodson,* supra, 491 S.W.2d at 338. A victim confronting a suspect who is handcuffed and in the custody of the police does not render the confrontation impermissibly suggestive. *State v. French,* supra, 528 S.W.2d at 173; *State v. Dodson,* supra, 491 S.W.2d at 338.

Furthermore, when an in-court identification is attacked on the ground that the pre-trial identification procedures violated due process, the inquiry extends not only to a determination of whether the procedures were unduly suggestive but also to whether there is an independent source of the identification. *State v. Barnes,* supra, 537 S.W.2d at 578.

■ Where there is an in-court identification made upon a factual basis independent from pre-trial identification procedures, the in-court identification is proper. *State v. Rutledge,* 524 S.W.2d 449, 456 (Mo. App.1975); *State v. Hall,* 541 S.W.2d 327, 328 (Mo.App.1976). Here there was ample evidence of an independent factual basis for Mr. Lada's in-court identification.

We conclude therefore that appellant's first point is without merit because (1) the point was not properly preserved, (2) the pre-trial confrontation was not so imper-

missibly suggestive so as to give rise to a very substantial likelihood of irreparable misidentification, and (3) there was ample evidence of an independent factual basis for the in-court identification.

Appellant's second point is that the court erred in denying his constitutional right to present a defense witness when the court failed to allow him to call Mr. Amos Ingram in his case. He argues that the refusal of the court to allow him to call Mr. Ingram as a defense witness in his behalf denied him his constitutional right to "have witnesses heard." He relies upon *State v. Scott,* 407 S.W.2d 79 (Mo.App.1966) and *State v. Blakeley,* 438 S.W.2d 262 (Mo.1969).

The circumstances on this point arose thusly. During the in-chambers discussions concerning the instructions, the court asked the defense attorney if he advised appellant "with respect to his rights to testify or not testify in this case." The attorney replied, "Yes, Your Honor, I asked him prior if he had any evidence or if he wanted to testify or wanted anybody else to testify in his defense. He said no, Your Honor." The court commented, "He never gave you the names of any witnesses or anything he wanted you to call?" Counsel replied, "None, Your Honor."

When the proceedings were resumed before the jury and the State rested, the court inquired of defense counsel. Counsel stated, "We have no evidence to present at this time, Your Honor." The instructions were then read to the jury. The court informed each counsel of the time for argument. Defense counsel then approached the bench and the following occurred:

"[Defense Counsel]: Your Honor, I was going to ask if we could approach the bench before final arguments.

"THE COURT: Yes, sir.

\* \* \* [At the bench]

"[Defense Counsel]: Just informed me that he wants Amos Ingram as a witness.

---

4. See also *State v. Jackson,* 477 S.W.2d 47, 51 (Mo.1972); *State v. Hamblin,* 448 S.W.2d 603, 607–608 (Mo.1970); *State v. Townes,* 461 S.W.2d 761, 763–764 (Mo.1970), *cert. den.,* 407 U.S. 909, 92 S.Ct. 2445, 32 L.Ed.2d 683; *State*

*v. Dodson,* supra, 491 S.W.2d at 338; *State v. Maxwell,* 502 S.W.2d 382, 389 (Mo.App.1973); *Russell v. United States,* 133 U.S.App.D.C. 77, 408 F.2d 1280 (1969), *cert. den.,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969).

"THE COURT: It's too late. It's too late.

"[Defense Counsel]: Okay. At least I made the request."

Closing arguments were then made. The jury retired and found the defendant guilty of robbery in the first degree by means of a dangerous and deadly weapon.

■ We find this point also to be without merit. The cases hold that the matter of reopening a case for the purpose of receiving additional evidence is a matter resting in the sound discretion of the trial court. *State v. Hunt,* 461 S.W.2d 879, 880–881 (Mo.1971). We find no abuse of discretion here. There was no indication as to what Mr. Ingram's testimony might be, and the request came at the close of all the evidence and after the instructions were read to the jury. The court inquired of counsel whether any witnesses were to be presented and counsel indicated he had consulted with appellant and there were none. In such circumstances we cannot conclude that the trial court abused its discretion in failing to permit appellant to call Mr. Ingram as a witness at that stage of the proceeding.

The cases relied upon by appellant are clearly not dispositive of this issue. *State v. Scott,* supra, is a prohibition case in which the court declared that a litigant has a right to require attendance at trial of those witnesses which in his judgment are required to meet the issues. In *State v. Blakeley,* supra, the defense had requested a subpoena, did not rest his case and made an offer of proof.

We have read the entire transcript, the briefs of the parties and all the authorities relied upon by the appellant and conclude that there is no prejudicial error.

The judgment is affirmed.

All the Judges concur.