STATE of Missouri, Respondent,

v.

Demetrius C. NELSON, Appellant.

No. WD 71762.

Missouri Court of Appeals,
Western District.

March 22, 2011.

Laura G. Martin, Kansas City, MO, for appellant.

Shaun J. Mackelprang and Richard A. Starnes, Jefferson City, MO, for respondent.

Before Division Three: CYNTHIA L. MARTIN, Presiding Judge, JAMES E. WELSH, Judge and GARY D. WITT, Judge.

CYNTHIA L. MARTIN, Judge.

Demetrius Nelson appeals from the trial court's judgment convicting him of attempted forcible sodomy, assault in the first degree, burglary in the first degree, and attempted robbery in the second degree after a bench trial. Nelson contends that the trial court erred: (1) in denying Nelson's motion to suppress the victim's out-of-court and in-court identifications of Nelson; and (2) in denying Nelson's motions for judgment of acquittal as to the count of attempted forcible sodomy. We affirm.

### Factual and Procedural History[1]

On September 6, 2008, just prior to 3:00 a.m., K.B. arrived home via taxi after a night out with friends. After paying the taxi driver, K.B. went inside and locked the door. Shortly thereafter, K.B.'s doorbell rang. When K.B. looked out through the window in the door she saw a black male wearing a black hat and all black clothes. K.B. later identified the man as Nelson. Nelson asked for "Crystal." K.B. responded that there was no one there by that name. Nelson turned, walked down the driveway, and headed down the street. At 2:54 a.m., K.B. called her fiancé at work and told him about the man at the door. K.B.'s fiancé told her to check all the doors and to get their gun. K.B. went and checked the other doors to make sure they were locked but as she was coming back toward the front door, Nelson kicked in K.B.'s front door. K.B. recognized Nelson as the man that had previously been on her front porch. K.B., still on the phone with her fiancé, screamed, "I have a gun" and turned to run up the stairs. As K.B. ran upstairs, Nelson chased her. K.B. yelled that she was on her period. Nelson caught up to K.B. upstairs and knocked her phone out of her hand. Nelson grabbed K.B. from behind placing one arm around her neck and one hand over her mouth. During the struggle, K.B.'s dress slid down. K.B. was barely able to breathe. Nelson demanded money and threatened to kill K.B. Nelson touched K.B.'s breast and then, while maintaining a grip on K.B.'s face, Nelson "felt around [her] privates." In doing so, Nelson penetrated K.B.'s outer genitals but not her vagina.

Nelson continued to choke K.B. harder while rummaging through her dresser drawers. K.B. gasped for air. K.B. attempted to direct Nelson to another room where there was money. Nelson released K.B.'s neck and then punched her in the side of the head with his fist fifteen times. Nelson got up and ran out of the house. K.B. called 911 at 3:00 a.m.

K.B.'s fiancé arrived home and found their front door kicked in. He saw K.B. at the top of the stairs on the phone with 911, nose bleeding, and face swelling. Police Officer Ryan Swope responded to K.B.'s residence. K.B. described her attacker as a black male, approximately six feet tall, medium build, and in all black clothing. A call went out to other police officers in the area with the description of the attacker.

Police Officer Jeremy Dummit was in the area on a different call when he and two other officers saw a man matching the description running down the street a few blocks from K.B.'s residence. They

---

1. We view the facts in the light most favorable to the verdict. *State v. Brand,* 309 S.W.3d 887, 890 n. 2 (Mo.App. W.D.2010).

chased the man by vehicle and then on foot when the man ran between houses. The officers yelled, "Police," but the man kept running and jumped three fences before Officer Dummit lost sight of him. Officer Dummit radioed the other officers in the area regarding his whereabouts and the last location he had seen the man. In less than a minute, Officer Dummit heard over the radio that the suspect was in custody.

Police Officer Jennifer Crump and her partner also responded to the area and proceeded to set up a perimeter to do an area canvas for the suspect. Officer Crump and her partner continued to get calls from the dispatcher with more information. They approached a privacy fence a few blocks from K.B.'s residence. When they opened the gate, they found Nelson, out of breath and sweating and in all black clothing. Nelson was taken into custody. Once handcuffed and on the ground, Nelson closed his eyes. Nelson refused to walk or answer any questions. An ambulance was called for Nelson as the officers could not determine if Nelson had a medical problem or if he was faking.

In approximately five to ten minutes from when the broadcast of the suspect's description went out, the police officers at K.B.'s residence were notified that Nelson had been apprehended. Less than a half an hour after the police arrived at K.B.'s residence, K.B. was taken by ambulance to the location where Nelson had been found. K.B. identified Nelson as her attacker. K.B. was transported to the hospital for treatment of her injuries which included swelling and abrasions to the right side of her face; a cut lip requiring three stitches; a contusion to the left side of her head; several contusions to her scalp; and bruis-

ing to the back of her neck, knee and arm. After the incident, K.B. had bad headaches and missed a couple weeks of work.

Nelson was taken to the hospital where he remained unresponsive to the medical personnel. The medical staff decided to use a catheter to extract urine to determine Nelson's medical situation. Before they could do so, Nelson sat straight up in the bed and said, "Don't put that thing in my dick." Nelson refused any further treatment and was transported to police headquarters. When the police interviewed Nelson, Nelson claimed he had no recollection of the attack because he had smoked a PCP-laced cigarette earlier that day. Nelson admitted he had no reason to be in the area of the crime. Clothing seized from Nelson included black pants, a black t-shirt, black tennis shoes, and a black coat.

Nelson was charged as a prior offender with attempted forcible sodomy, assault in the first degree, burglary in the first degree, and attempted robbery in the second degree. After a bench trial, Nelson was convicted on all counts and sentenced to a total of eighteen years imprisonment.[2] Nelson appeals.

## Point I

In Point One, Nelson contends that the trial court erred in denying Nelson's motion to suppress K.B.'s out-of-court and in-court identifications of Nelson. Nelson claims that the identifications violated his rights to due process and a fair trial because: (1) the identification was the result of an unnecessarily suggestive police procedure which created a substantial risk of misidentification; and (2) the reliability of the identification was highly questionable

2. Nelson was sentenced to twelve years on the attempted forcible sodomy, six years on the assault in the first degree, six years on the burglary in the first degree, and three years on the attempted robbery in the second degree. The twelve year sentence is consecutive to the other sentences which run concurrent to each other.

in that K.B. only had a brief opportunity to view the man, that she was fixated on escape, scared and hysterical, and that her description was not a complete match to Nelson.

## Standard of Review

■■ In reviewing the trial court's denial of a motion to suppress, we consider the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling. *State v. Brand*, 309 S.W.3d 887, 892 (Mo. App. W.D.2010) (citing *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005)). "[W]e review the facts and inferences therefrom in the light most favorable to the trial court's ruling, and disregard all contrary inferences." *State v. Chambers*, 234 S.W.3d 501, 512 (Mo.App. E.D.2007). Our review is limited to a determination of whether there was sufficient evidence to support the trial court's findings. *Id.* "We will not disturb the trial court's decision to admit or exclude evidence unless there has been an abuse of discretion." *Id.* We defer to the trial court's superior opportunity to judge the credibility of the witnesses at the suppression motion hearing. *Id.*

## Analysis

■■ Prior to trial, Nelson filed a motion to suppress the in-court and the out-of-court identifications of Nelson by K.B. The trial court took the motion with the case. Nelson claims that the trial court erred in denying his motion to suppress K.B.'s identification of him as her attacker because the identification was the result of a suggestive "show-up" and that it was unreliable.

The law regarding the admission of pretrial and in-court identification testimony is guided by standards set forth in *State v. Higgins*, 592 S.W.2d 151, 158–160 (Mo. banc 1979) (overruled *on other*

grounds). Where pretrial identifications have been made, this court will first look to see whether the procedures employed during those identifications were impermissibly suggestive. If they were, then we will consider whether those suggestive pretrial procedures affected the reliability of the identifications that were made at trial. *Reliability, not suggestiveness, determines the admissibility of identification testimony.* *State v. Robinson*, 849 S.W.2d 693, 696 (Mo.App. E.D.1993) (emphasis added). Nelson must establish the first prong of the test, that the pre-trial procedures were impermissibly suggestive, before a review of the reliability of the identification is even necessary or appropriate. *Chambers*, 234 S.W.3d at 513.

Nelson claims that the suggestive elements to the procedure used here include: that Nelson was in handcuffs on a stretcher, that Nelson was pointed out by the police officers, there was a flurry of activity, and that K.B. knew that the police were tracking a suspect in her neighborhood. However, Nelson asserts that the one element that singularly makes the procedure unduly suggestive is that the police told K.B. that *the* man who broke into her home was in police custody. Nelson's argument is without merit.

■■ "A pre-trial identification procedure is unduly suggestive if the identification results not from the witness's recollection of first-hand observations, but rather from the procedures or actions employed by the police." *Id.* Missouri courts have recognized that allowing the victim to see the suspect at the scene of the crime or at the scene of the arrest is an approved procedure. *State v. Overstreet*, 694 S.W.2d 491, 495 (Mo.App. E.D.1985). Only where the witness made the identification as a response to the suggestions or encouragement of the police, rather than on his own

observation and visual recollection of the defendant's appearance will this procedure be deemed unduly suggestive. *Id.* "Further, the shorter the length of time between the crime and the confrontation, the greater the reliability of the identification because the details are fresh in the witness's mind." *Id.* It is not improper for police to inform a victim that they have a suspect that the victim may be able to identify. *Id.* Further, courts have found the identification admissible even where a suspect was in handcuffs at the time of identification. *Id.*; *State v. White,* 549 S.W.2d 914, 918 (Mo.App.1977) (identification of defendant as he sat handcuffed in police car admitted into evidence).

Here, the record does not establish that the identification was unduly suggestive. When Officer Swope was notified that there was person in custody, he advised K.B. that "we had a suspect fitting the description in custody." K.B. identified Nelson as her attacker without any suggestion or encouragement by police at the scene of Nelson's arrest. K.B. testified that when they got to the location where Nelson was being held, she got out of the ambulance and was directed to Nelson who appeared to her to be unconscious on a stretcher. The officers simply asked her, "Is this the person that broke into your home?" to which K.B. replied, "Yes." K.B. stated he had on the same clothes, hair and "everything." Clearly, K.B. operated on her own observation and visual recollection. Additionally, the length of time between the attack and the identification was less than a half an hour. We hold the identification was not impermissibly suggestive.

▪ Even had this identification been impermissibly suggestive, that determination alone is not enough to suppress the identification. "Pretrial identifications that were found suggestive have been held to be admissible as long as they were reliable." *Robinson,* 849 S.W.2d at 696. Nelson generally argues that K.B.'s identification was unreliable in that the attack was brief, that her attacker was behind her for the majority of the incident, that she was hysterical and afraid of being raped, and that her descriptions of the attacker were inaccurate as to height, weight, clothing, and hair.

▪ "The key issue in determining whether unduly suggestive pre-trial procedures tainted the identification is whether the witness has an adequate basis for the identification independent of the suggestive procedure." *Chambers,* 234 S.W.3d at 513 (citing *State v. Glover,* 951 S.W.2d 359, 362 (Mo.App. W.D.1997)). The following five factors are relevant in assessing the reliability of identification testimony: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of uncertainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Robinson,* 849 S.W.2d at 696.

Here, Nelson concedes that "K.B. was quite certain that she'd identified the man who attacked her" and that the identification occurred within a short time. Nelson only argues the remaining three factors.

As to K.B.'s opportunity to view Nelson, Nelson argues that her opportunity was limited in that the whole incident was brief and that after an initial glimpse, K.B. never saw him face to face again. However, the record reflects that K.B. had ample opportunity to view Nelson. First, K.B. viewed Nelson standing on her front porch. K.B. testified that she was able to clearly see Nelson as the front porch was well lit by a bright light inside K.B.'s entry way that shines through out onto the

porch, in addition to a motion sensor on the front porch light. Second, K.B. viewed Nelson after he kicked open her front door and came towards her. K.B. testified, "Once he was in the house, I could see plain as day with all my lights in the living room on." K.B.'s fiancé testified that K.B. told him on the phone that she got a good look at Nelson when he was on their front porch.

Regarding K.B.'s degree of attention, Nelson argues that K.B.'s perception was impaired because she was intoxicated and that she was not focused due to her fears and emotions. The record reflects that although K.B. admitted drinking alcohol during the night, she denied intoxication at the time of the attack. K.B. stated that she had stopped drinking for awhile and had some food. After she watched Nelson leave her front porch, she was scared.

Officer Swope testified that when he made contact with K.B., "her speech was not slurred, she wasn't incoherent, and she wasn't staggering when she walked." Officer Swope testified that he absolutely did not have any concerns about K.B.'s ability to accurately relate the facts of what occurred.

Paramedic, Amy Van Holland, responded to K.B.'s residence at 3:11 a.m. and testified regarding K.B.'s level of intoxication that, "She answered all our questions appropriately. She was able to walk fine. She did not appear to be too intoxicated at all."

As to the accuracy of prior descriptions of Nelson, Nelson takes issue with the fact that K.B.'s descriptions to different people varied as to length of hair, whether he was wearing a hat, and approximate height. Nelson argues that K.B.'s description of her attacker as six foot tall and medium build was inaccurate as compared to Nelson's height and weight listed in the police arrest report. However, Officer Crump testified that her report described Nelson as 5'8 and weight at 140 only because that was the information on Nelson's ID.

The record reflects that K.B. consistently described her attacker as a black male wearing all black clothing. The crime scene technician collected Nelson's clothing once he was in custody which included a pair of black pants, a black shirt, black tennis shoes, and a black coat.

Although Nelson concedes the final two factors do not weigh in his favor, we note K.B. was absolutely certain in her identification. Officer Crump was present at the scene when K.B. identified Nelson as her attacker. Officer Crump testified that K.B. looked at Nelson and said, "Yes, that's him." Officer Crump asked K.B. if she was sure to which K.B. replied, "Yes, that's him." Officer Crump testified that nobody at the scene had said anything to K.B. before she identified Nelson. In addition, the identification took place in less than a half hour from the police response to K.B.'s residence.

We find K.B.'s identification of Nelson as her attacker reliable and find the trial court was not clearly erroneous in its ruling. Point one is denied.

### Point II

In Point Two, Nelson contends that the trial court erred in denying his motions for judgment of acquittal as to the count of attempted forcible sodomy. Nelson argues that the State's evidence was insufficient to support a finding of guilt beyond a reasonable doubt as to attempted forcible sodomy in that the State failed to prove that Nelson put his hands on K.B.'s vagina as charged. Nelson argues that the State only presented evidence that Nelson touched K.B.'s outer genitals but did not penetrate K.B.'s vagina. Nelson argues that without penetration, it was

anatomically impossible for Nelson to put his hand on K.B.'s vagina, an internal organ.

### Standard of Review

"Appellate review in this case 'is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.'" *State v. McGinnis,* 317 S.W.3d 685, 686 (Mo.App. W.D.2010) (quoting *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993)). "In determining whether the evidence is sufficient to support a conviction, we accept as true all evidence and inferences in a light most favorable to the verdict and disregard all evidence and inferences to the contrary." *State v. Olten,* 326 S.W.3d 137, 139 (Mo.App. W.D.2010). "This standard for reviewing the sufficiency of the evidence applies in both court-tried and jury-tried cases." *McGinnis,* 317 S.W.3d at 686.

### Analysis

Nelson claims that because he was charged with attempted forcible sodomy for putting "his hands on [K.B.'s] vagina" in the Information in Lieu of Indictment and the evidence at trial only showed that Nelson penetrated K.B.'s outer folds of her genitalia but did not penetrate her vagina, there was insufficient evidence that Nelson touched K.B.'s vagina and, as such, there was insufficient evidence to support his conviction for attempted forcible sodomy. We disagree.

Section 545.030 [3] states in pertinent part:

No indictment or information shall be deemed invalid, *nor shall the trial, judgment or other proceedings thereon be ... in any manner affected:*

. . . .

(14) For any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged; nor

. . . .

(18) For any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits.

(Emphasis added.)

Nelson was charged pursuant to section 566.060 which provides:

A person commits the crime of forcible sodomy if such person has deviate sexual intercourse with another person by the use of forcible compulsion. Forcible compulsion includes the use of a substance administered without a victim's knowledge or consent which renders the victim physically or mentally impaired so as to be incapable of making an informed consent to sexual intercourse.

"Deviate sexual intercourse" is defined:

[A]ny act involving the genitals of one person and the hand, mouth, tongue, or anus of another person or a sexual act involving the penetration, however slight, of the male or female sex organ or the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person or for the purpose of terrorizing the victim.

Section 566.010(1).

Section 564.011.1 provides:

A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A **"substantial step"** is conduct which is strongly corroborative of the firmness of the ac-

---

**3.** All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

tor's purpose to complete the commission of the offense.

Here, Nelson is not claiming that there was insufficient evidence to convict him of attempted forcible sodomy. In fact, contact with the vagina is not a required element of attempted forcible sodomy. Instead, Nelson is claiming that there was insufficient evidence of the crime as charged in the Information in Lieu of Indictment-that he touched K.B.'s vagina.

■■■ "The purpose of an indictment is to enable the accused to make his defense and to enable him to assert double jeopardy in bar of a further prosecution[.]" *State v. Dayton*, 535 S.W.2d 469, 478 (Mo. App.1976).

> The term sodomy embraces any unnatural corporeal copulation and on penetration the crime becomes complete.... Sodomy is of a vile and degrading nature, and for that reason, the strict rules of pleading have not been followed in charging the crime. As long as the act of sodomy charged falls within the statutory definition and the indictment informs the accused of the charge against him, the details of the commission are generally unnecessary.

*Id.* at 479 (internal citations omitted).

Thus, the language of how Nelson committed the crime was surplusage. *Id.* "Any description that does appear in the indictment is, therefore, surplusage and cannot affect the outcome of the trial." *State v. Smith*, 944 S.W.2d 901, 917 (Mo. App.W.D.1997). The State is not required to prove surplus language in the information. *State v. Collis*, 849 S.W.2d 660, 663 (Mo.App. W.D.1993) (held State not required to prove forcible compulsion as alleged in information in prosecution for sodomy where child under 14 because the language was surplus).

Although Nelson has framed his argument as a sufficiency of evidence argument, it is at most an unpreserved issue of variance in that the charging document varied from the evidence presented at trial.

> Because the defense counsel failed to object to the variance between the facts alleged in the information and the facts proven at trial, our review is for plain error. This review involves a two step-process. First, we determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or a miscarriage of justice has resulted.... Absent a finding of facial error, an appellate court should decline its discretion to review the claim. If plain error is found, we proceed to the second step to consider whether the error actually resulted in manifest injustice or a miscarriage of justice.

*State v. Barnes*, 312 S.W.3d 442, 443 (Mo. App. S.D.2010) (internal citations omitted).

■■■ In order for the variance to amount to reversible error, Nelson must be prejudiced. *Id.* To be entitled to relief, Nelson must demonstrate that he would have been better able to defend his case had the Information not varied from the evidence presented at trial. *Id.* at 444.

Here, the record shows that Nelson was not prejudiced. Nelson was able to adequately defend against the charge of attempted forcible sodomy, despite the claimed inconsistency between the Information and the evidence presented at trial. The variance would not have changed Nelson's ability to defend his case and was immaterial in view of Nelson's theory of defense. Nelson's defense was misidentification and that Nelson did not intend to

arouse or terrorize, just to rob. Nelson did not put on any evidence.

This variance, even if presumed, was not prejudicial. Nelson suffered neither a manifest injustice nor a miscarriage of justice. The trial court did not err in denying Nelson's motions for judgment of acquittal. Point two is denied.

## Conclusion

We affirm the trial court's judgment.

All concur.