

# In the
# Missouri Court of Appeals
# Western District

| | |
|---|---|
| STATE OF MISSOURI,<br><br>        **Respondent,**<br><br>v.<br><br>BRANDON J. NAYLOR,<br><br>        **Appellant.** | **WD78208**<br><br>**OPINION FILED:**<br><br>**NOVEMBER 22, 2016** |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Charles H. McKenzie, Judge**

**Before Division II: Lisa White Hardwick, Presiding Judge, Karen King Mitchell, Judge,**
**Anthony Rex Gabbert, Judge**

Brandon J. Naylor appeals from a judgment entered upon a jury verdict convicting him of

first-degree burglary and third-degree assault, for which he was sentenced as a persistent

offender to a total of fourteen years' imprisonment. He contends that the circuit court abused its

discretion in overruling his motion to suppress the victim's in-court and out-of-court

identifications, and in excluding the testimony of an expert in eyewitness identification. We

affirm.

## Factual Background

The facts, as relevant to Naylor's points on appeal, are that on June 11, 2013, just after

8:40 p.m., the victim, J.S., had just put her two-year-old son to bed, turned off the main light in

the living room, and was starting to watch a movie. A man whom J.S. had never seen before then walked into her home through the unlocked front door. J.S. initially thought it was her husband arriving home and when she realized it was not her husband, J.S. jumped up and told the man to get out. She then struggled with the man, knocking over a speaker to block the entranceway to her son's room. The man hit her in the face during the scuffle, leaving bruising that lasted for a couple of weeks. J.S. grabbed a fireplace poker and struck the man in the back with it causing his glasses to fall off. As he leaned over to get his glasses, J.S. hit him again and the man then exited J.S.'s residence. J.S. testified that she was face to face with this individual for at least a couple of minutes. A twenty dollar bill that J.S. had recently received from babysitting and that was laying on top of J.S.'s entertainment center was missing. J.S. testified that she had previously received self-defense, police, and rape prevention training, and this training contributed to the defensive manner in which she handled the situation.

The man left through the front door, on foot. Once J.S. was sure that he had left, she ran to her son's room to calm her son down. During the fray J.S. heard him in his bedroom saying, "Mommy, it's okay. It's okay. It just fell over. Mommy, it's okay." J.S. then called 911. J.S. described the intruder to the dispatcher as a white male with "lightish" brown hair, approximately 5'11", wearing khaki shorts and a black t-shirt. When asked by the dispatcher if she could identify the assailant she stated, "Yes." Dispatch notified area police of the home invasion, describing the assailant and the location of the intrusion. Soon thereafter Officer Mark Showman and Officer Marcus Brooker of the Independence Police Department arrived at J.S.'s home to investigate the incident. A police dashboard camera shows officers responding to J.S.'s residence while there is still daylight outside.

Officer Joseph Hand was on patrol that evening and heard dispatch's notification regarding the intrusion; he was approximately one block away from J.S.'s residence when he observed Naylor walking down the street. Hand stopped to talk to Naylor because he "exactly matched the description of the suspect." A dashboard camera from Hand's patrol car captured Hand's interaction with Naylor. Naylor was wearing khaki shorts, a black jersey-type shirt with red numbers on it, and glasses. When Hand explained that he had stopped Naylor because he matched the description of a suspect in a reported burglary, Naylor pulled the front of his shirt out and said, "I guarantee they won't say what I was wearing." Although Hand never told Naylor where the burglary occurred, Naylor commented that "It couldn't have been me, the house was too far away." Hand relayed to dispatch that he had stopped a man closely fitting the suspect's description, but that the black shirt was a "jersey" type shirt with red numbers.

When police arrived at J.S.'s residence, J.S. repeated the description she had given the 911 dispatcher, but also told the responding officers that the intruder wore eyeglasses and that his black shirt had holes in it. Dashboard camera audio captures this exchange. Officers asked J.S. if she recalled if the shirt had any red numbers or lettering on it; J.S. did not recall any. Officers asked J.S. if she could identify the intruder and she immediately said, "Yes." In the audio police can be heard discussing between themselves that a potential suspect had been detained, and J.S. can be heard talking with her child. Police then asked J.S., "Is there someone you can call to watch the little one while we go look at him?" J.S. responded, "Do you have somebody in custody?" A police officer states, "Uh, possibly. Um, someone has, uh, some shorts and a, he has a different shirt on as well, but just in case, you know, he took off his shirt or something." A different officer states, "He's got on a black jersey, but it's got like the numbering, we just want to see if it's possible." The other officer then states, "You never know, people often change

3

clothes real fast so …." Showman and Brooker then informed Hand that they were going to bring J.S. to Hand's location to view Naylor. Hand, two other officers, and Naylor waited in front of Hand's patrol car for J.S. to arrive.

As officers were about to transport J.S. to where Hand had Naylor detained, the police dashboard camera shows what appears to be J.S.'s husband arriving home. Officers informed the man that a home invasion had occurred at his residence and J.S. then described the situation to him. Officers then told J.S. that they were going to put her in the back of the patrol car and drive to the location where the suspect was, stating, "that way he doesn't see you, I know he knows who you are but …." J.S.'s husband then asked, "You guys *have* the person then?" The officers replied, "Possibly" and followed that up with, "we don't know, we are going to see if she can identify him and …." Officers then transported J.S. a few blocks away to where Hand had Naylor detained.

Naylor was standing without restraints in front of a police car when the patrol car containing J.S. pulled up. Officers parked the car containing J.S. approximately seventy feet from where Naylor was located; they parked on the opposite side of 23rd street which is a four-lane road with a center turn lane. Even before the patrol car stopped, J.S. stated, "That's him." She said that she was "a hundred percent sure" of her identification.

Later that evening, J.S. recalled that the assailant had a couple of tattoos; one was a detailed cross located on one of his arms, and the other was a star located on one of his legs. J.S. testified at trial that she recalled the tattoos when she was lying in bed the night of the attack and she kept seeing the intruder over and over in her mind. The following day she notified a detective of her recollection. At trial, J.S. identified Naylor as the man who invaded her home and assaulted her. She also identified cross and star tattoos on Naylor as the tattoos she observed

4

the night of the crime. The court allowed this testimony over Naylor's objection that the procedure leading to J.S.'s identification of Naylor was impermissibly suggestive. The court found that the pretrial identification procedure was not impermissibly suggestive nor was the identification unreliable.

**Point I**

In Naylor's first point on appeal he contends that the circuit court abused its discretion in overruling his Motion to Suppress the victim's in-court and out-of-court identification of him, and in admitting over objection the identification at trial, because the identification was the result of an unnecessarily suggestive police procedure which created a substantial risk of misidentification. He argues that he was prejudiced because, without the identifications, there was insufficient evidence to convict him of the charged offenses.

"We review a trial court's decision to grant or deny a motion to suppress to determine if there was substantial evidence to support the decision, and will only reverse if the trial court's ruling was clearly erroneous." *State v. Lewis*, 431 S.W.3d 7, 13 (Mo. App. 2014). "[W]e will reverse admission of testimony only if the trial court abused its discretion." *State v. Morgan*, 480 S.W.3d 349, 351 (Mo. App. 2015). We consider the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence supports the trial court's denial of the motion to suppress. *State v. Gaw*, 285 S.W.3d 318, 319 (Mo. banc 2009). "[W]e view the entirety of the record before us in the light most favorable to the trial court's ruling on the motion to suppress[.]" *State v. Ruff*, 360 S.W.3d 880, 885 (Mo. App. 2012).

"Identification testimony is admissible unless the pretrial identification procedure was unnecessarily suggestive *and* the suggestive procedure made the identification unreliable." *State v. Middleton*, 995 S.W.2d 443, 453 (Mo. banc 1999). "However, unless we find the identification

5

procedure to have been impermissibly suggestive, we need not examine the identification's reliability." *Cothran v. State*, 436 S.W. 3d 247, 251 (Mo. App. 2014). "Identification testimony is only subject to exclusion when the procedures used were so suggestive that they created a very substantial likelihood of irreparable misidentification." *Id.* (internal quotation marks and citation omitted). "[A]n identification procedure is unduly suggestive if the identification occurs because of the procedure or by police action and not because of the witness's recall." *Id.*

"Missouri courts have recognized that allowing the victim to see the suspect at the scene of the crime or at the scene of the arrest is an approved procedure." *State v. Nelson*, 334 S.W.3d 189, 193 (Mo. App. 2011). The shorter the length of time between the crime and when a witness to the crime can potentially identify a suspect increases the reliability of the identification. *Id.* at 194. "Only where the witness made the identification as a response to the suggestions or encouragement of the police, rather than on his own observation and visual recollection of the defendant's appearance will this procedure be deemed unduly suggestive." *Id.* at 193-194. "It is not improper for police to inform a victim that they have a suspect that the victim may be able to identify." *Id.* at 194.

Here, Naylor contends that the identification procedure was impermissibly suggestive because, prior to J.S. being shown Naylor, officers informed J.S. that they had someone in custody, that the individual had a different shirt on, that the individual could have changed clothes, and that J.S. would be transported in the back of the patrol car so that she would not be seen but, "I know he knows who you are." Naylor argues that the officers thereby told J.S. that they had the correct individual in custody.

The trial court had the opportunity to hear and see the exchange on the police dashboard camera and reach the conclusions it did. From the video it does not appear from listening to the

6

officer's statements accompanied with the inflection in the officers' voices when making those statements that the officers were suggesting to J.S. that the man they had detained was the same man as described by J.S. The officers used words such as "possibly" and "we don't know" with regard to whether they actually had J.S.'s assailant in custody. It also appears from listening to the audio that the officer's statement, "I know he knows who you are," was an explanation to J.S. that, if the man detained happened to be the assailant, he would not see her in the back seat of the patrol car, although the true assailant obviously already knew what J.S. looked like. Therefore, in reviewing the record in the light most favorable to the trial court's ruling and in disregarding all contrary inferences, it is not apparent that suggestions or encouragement by police prompted J.S.'s identification, or that the procedures used were so suggestive that they created a very substantial likelihood of irreparable misidentification.[1] However, even if the statements could be considered impermissibly suggestive, we find J.S.'s identification of Naylor reliable.

The five factors of identification reliability that are typically reviewed if police procedures are found suggestive include the opportunity of the witness to view the criminal during the crime, the witness's degree of attention, the accuracy of the witness's prior description, the witness's degree of certainty, and the length of time between the crime and the confrontation. *Cothran v. State*, 436 S.W.3d 247, 252 (Mo. App. 2014).

Here, the record reflects that J.S. was face to face with the intruder for approximately two minutes. J.S. engaged in a physical struggle with the intruder, observed him as he left her home, observed the direction in which he traveled, and watched long enough to ensure that he was not

---

[1]We, however, do not condone the officers' discussion of the identifying characteristics of the suspect prior to bringing the victim to observe and attempt to determine if they had the proper person in custody. We would urge more caution in the future so there is no question as to the validity of the identification.

coming back. When asked, J.S. expressed confidence to the 911 dispatcher that she could identify the intruder. J.S.'s confidence did not waiver when a responding officer also asked J.S. if she could identify the intruder. J.S.'s description of the intruder immediately after the crime very closely matched Naylor's appearance when he was detained a few blocks from J.S.'s home. J.S. described the intruder as being a white male with short "lightish" brown hair, glasses, khaki shorts, and a black t-shirt. Naylor, a white male with short brown hair, was wearing glasses, khaki shorts, and a black shirt with red numbering/lettering when he was detained.[2] Although J.S. described the intruder's shirt as only a black t-shirt with holes, and the shirt Naylor was wearing was a black jersey-type shirt with jersey holes and red numbers, this discrepancy alone does not prove the identification unreliable. Where the identification is found reliable and admissible after consideration of the five factors of identification reliability, identification discrepancies become matters for the jury to weigh and decide.[3] *See State v. Winters*, 900 S.W.2d 636, 641 (Mo. App. 1995). J.S. expressed certainty in her identification. Immediately upon seeing Naylor, and without any commentary or prompting from police, J.S. identified Naylor as the assailant. When J.S. had the opportunity to observe Naylor, only minutes had elapsed since the home invasion.

---

[2]Although Naylor suggests inaccuracy in J.S.'s recollection regarding the height of the assailant due to her telling the 911 dispatcher that he was approximately 5'11" in height, but responding officers testified that she stated that he was 5'5 to 5'7", there was no evidence at trial from which we can confirm the accuracy or inaccuracy of either of these descriptions. The defense asked Officer Showman if Naylor appeared to be 5'5" to 5'7" and Showman responded, "Probably the top end of five-seven." Showman was asked his own height which he reported to be 5'7 ½". Showman was asked to step down from the witness stand and Naylor was asked to stand up, apparently so that the jury could compare the heights of the two. We have no way of knowing the inferences that were drawn from this comparison and, while the defense pointed out that two varying heights were reported, the defense never argued to the jury that J.S.'s height description was inaccurate. The aforementioned was before the jury, however, when the jury drew its own conclusions as to the reliability of the identification.

[3]Here, Naylor argued to the jury that J.S.'s identification was based on police suggestiveness and was unreliable due to discrepancies with J.S.'s recollection of the assailant compared with Naylor's appearance when detained.

We find that all five factors of identification reliability support the reliability of J.S.'s identification. The record supports that J.S.'s identification of Naylor as the assailant was based not on police suggestiveness, but on J.S.'s personal and recent face to face interaction with Naylor. Naylor's first point on appeal is denied.

**Point II**

In Naylor's second point on appeal he contends that the circuit court abused its discretion in excluding the testimony of an expert in the field of eyewitness identification. He argues that the testimony was admissible and relevant to his defense, would not have invaded the province of the jury, and would have assisted the jury in its evaluation of the evidence. Naylor contends that the exclusion prejudiced him because, had the jury heard the testimony, it would not have found him guilty. We find no abuse of discretion.

"The decision to admit or exclude expert testimony is in the sound discretion of the trial court." *State v. Jones*, 322 S.W.3d 141, 144 (Mo. App. 2010). "The trial court abuses its discretion when a ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* If reasonable people could differ as to whether the trial court's ruling was justifiable, there has been no abuse of discretion. *Id.* The admissibility of expert testimony is measured in terms of whether the testimony will be helpful to the jury and should address a subject about which the jurors lack experience or knowledge. *Id.* (internal quotation marks and citation omitted). The expert's testimony should not detract from the relevant issues. *Id.*

Here, Naylor sought to introduce the testimony of Dr. John Gambon, an expert in the field of eyewitness identification. The State moved to exclude this evidence and the court sustained the motion. At trial and after the State rested, Naylor again sought to have Gambon

9

testify. The court disallowed the testimony but allowed Naylor to make an offer of proof. The court's order denying the testimony stated, in part:

> The Defendant seeks to have Dr. Gambon testify as an expert regarding factors that he believes have been shown through empirical research and studies to affect the reliability of an eyewitness identification. He would not be testifying about the particular identification in this case or commenting on the credibility of [J.S.]. The Court heard testimony from Dr. Gambon regarding the testimony he would provide in this case. …
>
> The Court finds that the purpose of Dr. Gambon's testimony is to attempt to provide testimony that may have the affect [sic] of casting doubt on the credibility of the expected testimony from [J.S.] regarding the identification of the Defendant both to the police and during the hearing and trial. The Court does not believe that the admission of such testimony would aid the jury.

Our Missouri Supreme Court concluded in *State v. Lawhorn*, 762 S.W.2d 820, 823 (Mo. banc 1988), and *State v. Whitmill*, 780 S.W.2d 45 (Mo. banc 1989), that it is within the trial court's sound discretion to determine whether expert eyewitness identification testimony would aid the jury. This conclusion was premised on the belief that jurors may rely on their own experience to reach a judgment on what weight to give eyewitness evidence and "that such matters are within the general realm of common experience of members of a jury and can be evaluated without an expert's assistance." *Id. Lawhorn* and *Whitmill* further indicate that, while eyewitness identifications have been found unreliable in some instances, a defendant's rights at trial are still protected without expert eyewitness identification evidence where various other safeguards are provided, such as cross-examination of the identifying witnesses, making eyewitness identification concerns known to the jury in opening and closing statements, and by instructions given the jury regarding factors to consider in determining the reliability of an identification. *Whitmill*, 780 S.W.2d at 47 (citing *Lawhorn*, 762 S.W.2d at 823).

10

Here, Naylor does not argue that his trial was devoid of these "safeguards" but, rather, argues that, because many years have passed since *Lawhorn* and *Whitmill* were decided, scientific study and research now reveals that jurors do not understand the problems associated with eyewitness identification and suggests that *Lawhorn* and *Whitmill* should no longer be followed. Naylor cites cases from other jurisdictions to support his position.

Missouri appellate courts are constitutionally bound to follow the last controlling decision of Missouri's Supreme Court, regardless of how many years have passed since that decision was rendered. *See State v. Brightman*, 388 S.W.3d 192, 199 (Mo. App. 2012). Consequently, we find that the circuit court did not abuse its discretion in denying testimony by Naylor's eyewitness identification expert. Point two is denied.

## Conclusion

We conclude, therefore, that the circuit court did not abuse its discretion in overruling Naylor's motion to suppress the victim's in-court and out-of-court identifications, or in excluding the testimony of Naylor's eyewitness identification expert. The circuit court's judgment is affirmed.

_____
Anthony Rex Gabbert, Judge

All concur.

11